Nos. 2-09-0210 & 2-09-0242 cons.        Filed:  11-29-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DOROTHY PIELET, Individually and as Executor of the Estate of Arthur Pielet, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | No. 98--CH--1223 |
| v. | ) ) | |
| JAMES PIELET, J.P. INVESTMENTS, INC., PIELET BROS. SCRAP IRON AND METAL, INC., PIELET CORPORATION, NATIONAL MATERIAL, L.P., and N.M. HOLDING, INC., | ) ) ) ) ) ) | |
| Defendants | ) ) | Honorable David C. Hall and |
| (P.B.S. One, Inc., and Cyrus Tang, Defendants-Appellants). | ) ) | Mitchell L. Hoffman, Judges, Presiding. |

| | | |
|---|---|---|
| DOROTHY PIELET, Individually and as Executor of the Estate of Arthur Pielet, | ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | No. 98--CH--1223 |
| v. | ) ) | |
| JAMES PIELET, J.P. INVESTMENTS, INC., PIELET BROS. SCRAP IRON AND METAL, INC., PIELET CORPORATION, P.B.S. ONE, INC., and CYRUS TANG, | ) ) ) ) ) | |
| Defendants | ) ) | Honorable David C. Hall and |
| (National Material, L.P., and N.M. Holding, | ) | Mitchell L. Hoffman, |

Defendants-Appellants).       )     Judges, Presiding.

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Defendants, P.B.S. One, Inc. (PBS One), National Material, L.P. (National Material), N.M. Holding, Inc. (NM Holding), and Cyrus Tang (Tang), appeal the order granting summary judgment in favor of plaintiff, Dorothy Pielet, on counts IX, X, and XI of her fifth amended complaint. The allegation basic to all three counts is that defendants failed to honor a consulting agreement mandating lifelong monthly payments to plaintiff's late husband, Arthur Pielet (Arthur), and, after his death, to plaintiff for life (Consulting Agreement). Defendants also appeal the award of attorney fees to plaintiff pursuant to a fee-shifting provision in the Consulting Agreement. We reverse and remand.

PBS and Tang appealed in No. 2--09--0210, and National Material and NM Holding appealed in No. 2--09--0242. We consolidated the cases for review.

## I. Plaintiff's Complaint

Plaintiff initiated this lawsuit in 1998 and filed her fifth amended complaint (complaint) on July 19, 2005. She pled 11 counts. Counts I, II, and III named James Pielet (James), who is plaintiff and Arthur's son, and alleged breach of contract, promissory estoppel, and equitable estoppel. Count IV named J.P. Investments, Inc., and alleged breach of contract. Count V named Tang and PBS One and alleged fraudulent conveyance. Counts VI, VII, and VIII alleged director liability, breach of fiduciary duty, and distributee liability against Tang. Counts IX and X named National Material and NM Holding and alleged breach of contract and successor liability, respectively. Finally, count XI named PBS One and alleged breach of contract.

Only counts IX, X, and XI are at issue in these appeals. The common allegations in these counts are as follows. In December 1986, Arthur entered into the Consulting Agreement with James, then president of Pielet Bros. Scrap Iron and Metal, Inc. (Pielet Inc.). In 1988, Pielet Brothers Scrap Iron and Metal LP (Pielet LP) was formed in a two-step transaction. First, Pielet Inc.[1] sold an undivided one-half interest in its assets to PBS One, a company of which Tang was "the sole director, sole shareholder, and president." PBS One "expressly assumed [Pielet Inc.'s] obligations *** under the Consulting Agreement." Second, Pielet Inc. and PBS One transferred their respective one-half shares in Pielet Inc. to Pielet LP and consequently each gained a 49.5% limited partnership interest in Pielet LP. The remaining 1% general partnership interest was owned by Pielet/Tang Enterprises (PT Enterprises). James owned 49% of the stock in PT Enterprises and Tang owned the remaining 51%. Pielet LP consistently made monthly payments to Arthur under the Consulting Agreement. On June 1, 1994, PBS One was dissolved by the Illinois Secretary of State.

In January 1991,[2] PBS One transferred its 49.5% share in Pielet LP to National Material. NM Holding was then the general partner of National Material. In 1993, Pielet LP changed its name to Midwest Metallics. Thereafter, Midwest Metallics made payments under the Consulting Agreement until July 1998, when payments ceased altogether.

Count IX, the breach-of-contract claim against National Material, alleged that, as part of the January 1991 transfer, National Material "assumed the right, title, interest[,] and obligations" of PBS

---

[1]The complaint does not recognize the fact that Pielet Inc. changed its name to Pielet Corp. before the transaction occurred. We recognize that change below in reciting the undisputed facts relevant to summary judgment.

[2]As noted below, December 31, 1990, is the actual date of the operative legal document.

One, including the Consulting Agreement. Plaintiff asserted that National Material's obligations under the Consulting Agreement were paid by Pielet LP and Midwest Metallics though the latter entities had "never contracted to assume the Consulting Agreement." Plaintiff alleged that, when Midwest Metallics ceased paying under the Consulting Agreement in July 1998, National Material "remained obligated to satisfy those payments" but did not pay. Plaintiff further alleged that NM Holding was liable as the general partner of National Material.

Count X alleged that National Material was liable under the Consulting Agreement as the "successor" of PBS One. Specifically, plaintiff asserted:

"Because National Material is a mere continuation of [PBS One] [and] expressly assumed [PBS One's] rights and obligations under the Consulting Agreement, and has acknowledged that it is the successor to [PBS One] in writing, all of the liabilities of [PBS One], including its liability under the Consulting Agreement, have been transferred and assumed to and by National Material."

Plaintiff further alleged that National Material's liability as successor to PBS One extended as well to NM Holding, the general partner of National Material.

Count XI alleged that, after its dissolution in 1994, PBS One "remained obligated under the Consulting Agreement" and that PBS One breached the Consulting Agreement when payments under the Consulting Agreement ceased in July 1998.

On February 14, 2006, plaintiff moved for summary judgment against PBS One and Tang on counts V and XI, and for summary judgment against National Material and NM Holding on counts IX and X. PBS One and Tang together filed an opposition brief and also a cross-motion for

summary judgment against plaintiff. National Material and NM Holding together filed their own opposition brief as well as a cross-motion for summary judgment against plaintiff.

## II. Undisputed Facts On Summary Judgment

In support of their summary judgment motions, the parties filed their proposed statements of undisputed facts. From these the trial court distilled a statement of undisputed facts as a basis for resolving the summary judgment motions. Aside from one issue that defendants claim involves a factual dispute (which we explain below), the parties do not challenge the trial court's statement of undisputed facts. We follow that statement here and in some instances incorporate some additional undisputed factual material in order to amplify and clarify certain points.

Pielet Inc. was formed by Arthur and his brothers shortly after World War II. Pielet Inc. was in the scrap metal business. In December 1986, Arthur sold his interest in Pielet Inc. to his sons James and Robert Pielet (Robert). On December 23, 1986, James, president of Pielet Inc., and Arthur signed the Consulting Agreement. The Consulting Agreement provided that Arthur would "act as a general advisor and consultant" to Pielet Inc. and that he would receive a yearly fee of $130,000, "payable in equal monthly installments." Arthur would be paid the fee until his death, after which his "widow" (unnamed) would receive the fee "for her life." The Consulting Agreement provided that the "inability [of Arthur] to render [consulting] services *** by reason of illness, disability or incapacity" would not be deemed "a breach or default by him." The Consulting Agreement further provided that it was binding "upon the parties [thereto], and their respective heirs, legal representatives, successors[,] and assigns."

In 1988, James, together with Tang, an outside investor with experience in the scrap metal business, agreed to form Pielet LP, a partnership. Tang was sole shareholder and owner of PBS One.

Shortly before the reorganization that led to Pielet LP, Pielet Inc. changed its name to Pielet Corporation (Pielet Corp.)[3] and James acquired Robert's shares, becoming sole shareholder. On April 12, 1988, several documents were executed to accomplish the restructuring. Each was signed by James as president of Pielet Corp. and by Tang as president of PBS One. The first was an "Asset Purchase Agreement" (Purchase Agreement). The preamble to the Purchase Agreement identifies Pielet Corp. as "Seller" and PBS One as "Buyer" and states:

"WHEREAS, Seller has its principal place of business in Argo, Illinois[,] and is engaged in the business of operating scrap metal shredding and recovery plants in Argo and McCook, Illinois[,] and Hammond and Indianapolis, Indiana (the 'Business');

WHEREAS, Seller and Buyer desire to form a limited partnership *** to own and operate the Business ***."

Article I is entitled "Purchase and Sale of Assets." Section 1.1 under article I is entitled "Agreement to Sell and Purchase" and states:

"Upon the terms and subject to the conditions set forth herein, and in reliance on the respective representations and warranties of the parties, Seller shall sell an undivided one-half (½) interest in and to the Assets (as defined below) to Buyer ***, and Buyer shall purchase such undivided one-half (½) interest in and to the Assets from Seller *** for the consideration and in accordance with the provisions of Article II hereof ***."

"Assets" is defined generally as "all the assets of Seller used or usable in connection with the Business." "Assets" specifically includes, inter alia,

---

[3]The parties appear to use "Pielet Inc." and "Pielet Corp." interchangeably. The relevant legal documents in this case refer to the company as Pielet Corp., and we will adhere to that usage.

"all of the contract rights of the Business, of any kind, nature or description, including rights arising under restrictive covenants and obligations of present and former officers and employees and of individuals and corporations, rights arising under joint venture agreements or arrangements, rights arising under leases of personal property, [and] rights arising under service and maintenance contracts ***, to the extent transferable."

Article II is entitled "Purchase Price and Payment Terms." Section 2.1 under article II is entitled "Purchase Price" and provides:

"The purchase price for the undivided one-half interest in the Assets *** shall be Six Million Dollars ($6,000,000) plus an assumption of one-half (½) of all the Seller's liabilities of every kind, nature or description whether fixed or contingent, choate or inchoate, perfected or otherwise, and whether due or to become due (the 'Assumed Liabilities'), which amount shall be allocated among the Assets as set forth on Schedule 2.1(a) attached hereto."

Under "Assumed Liabilities," the Purchase Agreement states: "Attached hereto as Schedule 3.1(t) is a correct list of Seller's liabilities as of March 31, 1988. The Seller's liabilities shall not exceed $200,000 of the liabilities listed on Schedule 3.1(t)." Schedule 3.1(t), entitled "Liabilities," states:

"1. All liabilities set forth on the Seller's financial statements for the year ended December 31, 1987[,] except those liabilities which have been paid or otherwise satisfied by Seller since December 31, 1987.

2. All liabilities set forth on Seller's balance sheet for the month ended March 31, 1988[,] except those liabilities which have been paid or otherwise satisfied by Seller since February 29, 1988.

3. All other liabilities which have arisen in the ordinary course of business since February 29, 1988[,] and all other ordinary course of business liabilities of Seller, whether or not reflected on the Seller's balance sheet or financial statements.

4. All liabilities or obligations of Seller as reflected in this Asset Purchase Agreement or any other Schedule attached hereto." (Emphasis added.)

Under a section termed "Material Contracts," the Purchase Agreement states:

"Attached hereto as Schedule 3.1(m) is a correct and complete list of every material contract, agreement, relationship, or commitment, written or oral, to which [Pielet Corp.] is a party, including, without limitation, union contracts and agreements relating to employment and services of independent contractors ***."

Among the contracts listed in schedule 3.1(m) is: "Consulting Agreement with Mr. Arthur Pielet dated December 23, 1986[,] providing for the payment of annual consulting fees of $130,000 for a term to end at the later to occur of the death of Arthur Pielet or his wife."

James and Tang also signed an "Assignment and Assumption Agreement" (Assignment Agreement), which identifies Pielet Corp. as "Assignor" and PBS One as "Assignee" and states:

"WHEREAS, pursuant to that certain Asset Purchase Agreement *** between the parties hereto, Assignor is selling to Assignee an undivided one-half (½) interest in all of Assignor's Assets relating to the Business (as such terms are defined in the Asset Purchase Agreement);

WHEREAS, Assignor is an obligor of certain obligations as are set forth on Schedule 3.1(t) to the Asset Purchase Agreement (the 'Assumed Liabilities'); and

WHEREAS, pursuant to [this] Agreement, Assignor desires to assign the Assignee

the Assumed Liabilities and Assignee desires to assume the Assumed Liabilities each from

and after the date hereof;

\*\*\*

1. Assignor hereby assigns, transfers, grants and conveys to Assignee, effective as of

the date hereof, the Assumed Liabilities;

2. Assignee does hereby accept the foregoing assignment of the Assumed Liabilities

and from and after the date hereof, assumes and agrees to perform all of the covenants,

agreements and obligations of the Assignor under the Assumed Liabilities."[4]

Finally, the Assignment Agreement states that it shall "inure to the benefit of and bind the parties

hereto and their respective successors and assigns."

The third of the three major documents signed by James and Tang on April 12, 1988, was

a limited partnership agreement forming Pielet LP (Partnership Agreement). The Partnership

Agreement specifies that, in exchange for their capital contributions, PBS One and Pielet Corp. each

received a participating percentage of 49.5% and was made a limited partner. The general partner,

PT Enterprises, received the remaining 1% participating percentage for its capital contribution. As

Tang owned 51% of PT Enterprises, he had in effect a majority participating percentage in Pielet LP.

Also on April 12, 1988, Tang sent a letter to Pielet Corp. stating:

---

[4]It might be possible to regard the Consulting Agreement as one of the "Assumed Liabilities" and to find PBS One's obligation under the Consulting Agreement limited to $200,000, per the cap in the Purchase Agreement. PBS One does not take that position on appeal, however, but disputes contractual liability on different grounds.

"Pursuant to the Partnership Agreement [of April 12, 1988], [PBS One] directs Pielet Corp. to transfer to the Partnership the undivided one-half (½) interest in and to all of the Company's Assets purchased by [PBS One] pursuant to the Purchase Agreement."

(The trial court's statement of undisputed facts states: "[B]oth Pielet Corp. and PBS One conveyed their respective one-half interests to [Pielet LP] in exchange for a 49.5% limited partnership interest in that entity." Although the parties agree that this occurred, we have found no document in the record that purports to effect that transfer.)

Attorney Michael Zavis's law firm represented Pielet Corp. in connection with the formation of Pielet LP in April 1988. In a February 22, 1999, affidavit, Zavis described the two-step process by which Pielet LP was created:

"4. In the first step of the restructuring, [Pielet Corp.] sold an undivided 50% interest in all of its assets to an Illinois Corporation named [PBS One], which was owned by [Tang]. This undivided 50% interest included various contracts to which [Pielet Corp.] was a party, including a written Consulting Agreement between [Arthur] and [Pielet Corp.] ***.

5. In the second step of the restructuring, a limited partnership was formed known as [Pielet LP] ***. In this second step of restructuring, [Pielet Corp.] and [PBS One] each contributed their respective undivided half interests in the assets and liabilities of the scrap metal business to the limited partnership [Pielet LP], which transaction included a transfer to the limited partnership of the Consulting Agreement and an assumption of [Pielet Corp.'s] liabilities and obligations under the Consulting Agreement."

Zavis described a conversation he had with Arthur before the April 1988 restructuring occurred:

"6. In 1988, before the restructuring transaction had been effected, I participated in at least one face-to-face meeting at my law offices at which [James], [Arthur], and [plaintiff] were present. During this meeting, I discussed with both [Arthur] and [plaintiff] various aspects of the restructuring, including, but not limited to, what was intended to happen with respect to Arthur's Consulting Agreement once the limited partnership [Pielet LP] was formed. I explained that the limited partnership was assuming [Pielet Corp.'s] obligations under the Consulting Agreement, that the limited partnership was substituting itself for [Pielet Corp.] under the Consulting Agreement, and would thereafter be making the payments to him in lieu of [Pielet Corp.]. I explained to Arthur that [Pielet Corp.] would no longer be obligated to him under the Consulting Agreement, and that the limited partnership would thereafter have such obligation. He agreed thereto expressing his desire to have the transaction concluded as soon as possible since the new entity would be financially stronger than [Pielet Corp.]."

At his September 21, 1999, deposition, Zavis was asked about the April 1988 formation of Pielet LP and about his conversations with Arthur and plaintiff beforehand:

"A. How would you characterize this meeting you had with Arthur and [plaintiff]?

Q. *** I discussed what was transpiring, and that--discussed the nature of the transaction and the contract obligations being taken over and assumed, ultimately, when it's all said and done, by this new entity that was being created between Cyrus Tang and [James] and--and--Cyrus Tang and [Pielet Corp.], and how it all transferred down.

A. Did you say anything else to him?

Q. I said that the payments now would be coming from--ultimately payments would

-11-

be coming from the new entity.

* * *

Q. It was your intent at this meeting to get a release from Arthur?

A. Absolutely not.  For whom?

Q. For anyone.

A. No.

Q. Was it your intent to work a novation for anyone here?

***

A. No.

Q. Was it your intent to have Arthur release rights that he had against [Pielet Corp.]?

A. No.

* * *

A. [N]ow, as far as your understanding of the meeting, Arthur never gave up any of his rights against the original debtor; is that correct?

Q. That is my understanding.  Well, my understanding of the meeting was that he wasn't asked to give up any rights against anyone on anything.

He was being informed of the transaction that was occurring and that it would have an impact on him because this was a significant transaction.  Other than information purposes, I had no purpose of discussing it with him.

Q. Nobody ever asked you to get a novation from him?

A. No.

Q. Nobody ever asked you to get a--to release his rights against [Pielet Corp.]?

A. Me? Ask me?

Q. Yes.

A. No.

Q. And that was not your intent?

A. No.

* * *

Q. Your understanding is, there was to be a written assumption of [Arthur's] consulting agreement obligation?

***

A. *** My understanding of the structure ultimately was, the assets and liability, all the assets and all liabilities of [Pielet Corp.] got transferred, ultimately, down into this partnership of which a company created by Tang owns a certain percentage as a separate company and a company--[James'] company had a percentage. ***

* * *

Q. [Y]ou signed an affidavit that the limited partnership was assuming [Pielet Corp.'s] obligation. Do you see that?

A. Yes, I do.

* * *

Q. You would think if there was to be an assumption, it would have been in writing, correct?

A. For everyone's sake, yeah. But you're using the word 'assumption.' I can assume something and the obligation is now owned by two parties.

I'm answering that it's my understanding when I wrote [the affidavit] *** that ultimately the transaction was all the assets and all the liabilities of [Pielet Corp.] were going down into an entity which was a limited liability partnership. *** And that was owned, let's call it 50/50, by two different entities and, therefore, an obligation that existed in [Pielet Corp.] was assumed by the new entity if it got transferred down there. That does not say that the original entity is released. It merely says 'assumed.' So far as I know, that's an accurate statement.

Q. And your understanding of the transaction or the activities at your office *** was that you were just informing [Arthur] that another entity was going to be liable on his contract, and that was [Pielet LP], right?

A. Correct.

Q. You did not have any intent of removing [Pielet Corp.] as an obligor, as a liable entity under that contract, isn't that correct?

A. I didn't have any intention of removing them, but I couldn't remove them anyhow unless they agreed.

Q. Nobody asked you to do that?

A. No.

* * *

A. To your knowledge, Mr. Zavis, do you know of any reason why [Pielet Corp.] or its successors are not liable on that consulting agreement?

MR. LIBOWSKY [Attorney for Zavis]: Object to the form of the question. You should answer if you can.

-14-

* * *

A. Sitting here at this moment in time, I don't--I can't recall any such fact."

On December 31, 1990, Tang signed a document with three sections: "Assignment," "Assumption," and "Consent," each with separate signatures (Assumption Agreement). Under the "Assignment" section, the document states:

"In consideration of $5,542,000.00 and other good and valuable consideration, *** [PBS One] a Limited Partner in [Pielet LP], an Illinois limited partnership, does hereby assign to [National Material] one hundred percent (100%) of [PBS One's] limited partnership interest in [Pielet LP] (representing 49.5% of the total outstanding partnership interest) based upon the Partnership Agreement of April 12, 1988."

Tang signed this section as president of PBS One.

Under the "Assumption" section, the Assumption Agreement states:

"In consideration of the Assignment to [National Material] by [PBS One] of one hundred percent (100%) of the limited partnership interest of PBS One in [Pielet LP] (representing 49.5% of the total outstanding partnership interest of [Pielet LP], an Illinois limited partnership) ***, [National Material] does hereby accept and assume [PBS One's] right, title, interest[,] and obligations in and to the extent of 100% of [PBS One's] limited partnership interest in [Pielet LP] (representing 49.5% of the total outstanding partnership interest) based upon the Partnership Agreement of [Pielet LP], dated April 12, 1998."

Tang signed this section as president of C.T. One (CT One), whose sole shareholder was Tang. CT One was the general partner of National Material. CT One controlled National Material. (CT One would later change its name to NM Holding.)

The third and final section of the Assumption Agreement, entitled "Consent," recited that PT Enterprises consented to the assignment and assumption. The section was signed by Tang as well. At his March 16, 2005, deposition, which was filed with the summary judgment motions, Tang affirmed that PBS One sold "everything" to National Material.

In 1993, Tang purchased James' entire interest in Pielet LP. James then formed J.P. Investments. After James withdrew from Pielet LP, Tang restructured. On December 1, 1993, he signed an amendment to the Partnership Agreement. The document recited that Pielet LP had been renamed Midwest Metallics. The amendment provided that National Material was "successor" to PBS One, and M.T. Two, Inc., "successor" to Pielet Corp., under the Partnership Agreement. The amendment also recited that PT Enterprises had changed its name to S.D. Metals, Inc.

In 1994, Tang decided to have PBS One legally dissolved. In June 1994, PBS One was dissolved by the Illinois Secretary of State. At his deposition, Tang explained his decision to have PBS One dissolved:

"[W]e have no reason to have the [sic] P.B.S. One at all. We have all the investment, you know, all finished. That's it. We just dissolved P.B.S. One. There was no purpose for that.

* * *

*** P.B.S. One has no employees, no creditors. We don't owe anybody. We don't have anything. Just an investment. Just the investment amount. ***

* * *

At that time we have no purpose for us to have P.B.S. One. We just closed the [sic] P.B.S. We just closed. We just have another company."

Also in 1994, CT One changed its name to NM Holding but Tang remained sole shareholder.

After its creation, Pielet LP made payments to Arthur under the Consulting Agreement. After Pielet LP was renamed Midwest Metallics, Arthur continued to receive payments under the Consulting Agreement. In July 1998, Midwest Metallics ceased operations and stopped making payments under the Consulting Agreement. No payments have been made since July 1998. Arthur died in 1999. Also in 1999, Midwest Metallics filed for bankruptcy.

### III. The Parties' Arguments and the Trial Court's Ruling

Plaintiff argued that PBS One was liable under the Consulting Agreement as a matter of law because PBS One expressly assumed Pielet Corp.'s liability under the Consulting Agreement when PBS One entered into the Purchase Agreement and Assignment Agreement with Pielet Corp. In response, PBS One and Tang[5] maintained that the evidence showed a novation whereby Pielet LP substituted for Pielet Corp. under the Consulting Agreement. In support of the novation defense, PBS One and Tang attached the February 22, 1999, affidavit of Zavis, described above. PBS One and Tang also acknowledged Zavis's September 21, 1999, deposition testimony, which had been submitted by plaintiff. They recognized that "Zavis arguably testified in his deposition inconsistently with the statements in his affidavit as to whether [Arthur] assented to the novation during that meeting" (emphasis in original). PBS One and Tang maintained, however, that Zavis's testimony "affirm[ed] the statements in his affidavit that [Arthur] intended to substitute [Pielet LP] for [Pielet Corp.]" PBS One and Tang claimed that, at the very least, Zavis's affidavit and deposition testimony raised an issue of material fact as to whether there was a novation.

---

[5]A summary judgment motion was filed jointly by PBS One and Tang and addressed count V, which named Tang and PBS One, count VII, which named Tang alone, and count XI, which named PBS One alone. (Counts V and VII are not at issue in this appeal.)

PBS One and Tang alternatively argued that, even if liability for the Consulting Agreement did pass to PBS One, plaintiff's claim still failed as a matter of law. PBS One and Tang noted that PBS One dissolved in 1994, four years before payments under the Consulting Agreement ceased. PBS One and Tang argued that, though section 12.80 of the Business Corporation Act of 1983 (805 ILCS 5/12.80 (West 2008)) (the Survival Statute) preserves certain claims against dissolved corporations, that section did not save plaintiff's claim. The Survival Statute provides:

"The dissolution of a corporation *** shall not take away nor impair any civil remedy available to or against such corporation, its directors, or shareholders, for any right or claim existing, or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within five years after the date of such dissolution." 805 ILCS 5/12.80 (West 2008).

Citing authorities suggesting that the Survival Statute preserves only causes of action that accrue before the corporation's dissolution, PBS One and Tang maintained that, since PBS One dissolved in 1994 and plaintiff's cause of action did not accrue until July 1998 when payments under the Consulting Agreement ceased, the Survival Statute did not preserve plaintiff's claim. PBS One and Tang further argued that none of PBS One's actions before it dissolved could be deemed the proximate cause of the later breach.

On the claims against National Material and NM Holding, plaintiff argued that they were liable as a matter of law under the Consulting Agreement because, when National Material signed the Assumption Agreement, it expressly assumed all "obligations" of PBS One, which, plaintiff suggested, naturally included the Consulting Agreement. Further, plaintiff argued that, even apart from the express assumption of liabilities, National Material and NM Holding were liable under

principles of successor liability because (1) National Material "was merely a continuation of [PBS One]"; (2) the Assumption Agreement effected a "de facto merger or consolidation of [PBS One] and National Material"; and (3) the transaction "was carried out for the fraudulent purpose of evading liability for [PBS One's] debts."[6]

On the breach-of-contract claim, National Material and NM Holding asserted that the Assumption Agreement made "no reference whatsoever to the Consulting Agreement, [Arthur], [plaintiff], or the general obligations of [PBS]" but by its express terms conveyed to National Material only a limited partnership interest in Pielet LP. Since in Illinois a limited partner is generally not responsible for the obligations of the partnership beyond the amount of the partner's investment, National Material could not be held liable under the Consulting Agreement, which was Pielet LP's obligation.

As for the claim of successor liability, National Material and NM Holding argued that the "mere continuation" argument failed because (1) the evidence showed that National Material could not have "continued" the business of PBS One because the latter had no business to begin with but, like National Material after it, was simply a passive investor in Pielet LP; and (2) in any case, liability of an entity that is simply a continuation of a prior one depends on whether the transfer was done with intent to defraud creditors, and here there could have been no such intent because National

---

[6]Although plaintiff separately alleged breach of contract and successor liability, the latter essentially subsumed the contract claim, as successor liability may be found, inter alia, where "an express or implied agreement of assumption exists" (Consolidated Services & Construction, Inc. v. S.R. McGuire Builder & General Contractor, Inc., 367 Ill. App. 3d 324, 329 (2006)).

Material paid PBS One considerable value for the assets purchased.[7] National Material and NM

Holding further argued that there was no merger agreement between PBS One and National Material

and that in fact PBS One remained a separate legal entity until it was dissolved in 1994.

On August 3, 2006, the trial court entered a written order holding that plaintiff was entitled

to summary judgment against PBS One, National Material, and NM Holding on counts IX through

XI. The court found as a threshold matter that the Consulting Agreement was valid. The court next

found that PBS One expressly assumed Pielet Corp.'s obligations under the Consulting Agreement.

The court held that the Survival Statute

"does not preclude [plaintiff's] action. [Arthur and plaintiff] had an existing right to payment

from PBS One prior to the company's dissolution, since PBS One assumed the Consulting

Agreement prior to that date. Even though [plaintiff's] legal claim to enforce that right did

not accrue until 1998, the Complaint was filed within five years of PBS One's dissolution.

PBS One's dissolution is the starting point for calculating the statute of limitations period

under the survival statute."

The court rejected PBS One's novation argument:

"The argument that [Arthur] entered into a novation substituting [Pielet LP] for [Pielet Corp.]

does not affect the fact that PBS One expressly assumed the Consulting Agreement, as

outlined above. Moreover, the portion of the record that PBS One/Tang cite in support of

this argument, which is the deposition transcript of Michael Zavis, does not support the

---

[7]Though plaintiff alleged "mere continuation" and fraudulent
intent as separate grounds of successor liability, National
Material and NM Holding believed that fraud was an element of the
"mere continuation" ground. They maintain that position on
appeal as well. As we explain below, this stance is mistaken.

argument so as to give rise to a genuine issue. Rather, the argument is mere speculation and does not preclude summary judgment."

Finally, though count XI named only PBS One, the court said regarding Tang himself:

"A further undisputed fact is that PBS One, at the time it was administratively dissolved, had already distributed its assets, comprised of primarily the $5.5 million received from National Materials [sic], to Cyrus Tang. *** PBS One was solely owned and controlled by Mr. Tang, who was the company's President, sole shareholder and sole director. ***

Under normal principles of corporate liability, Tang would not be personally liable to [plaintiff] for PBS One's breach of contract as a result of his status as a director or as a shareholder. PBS One, as a dissolved corporation that possessed few or no assets subsequent to the distribution of proceeds obtained from the 1991 sale of its interest in [Pielet LP], is not an entity from which [plaintiff] can expect to collect any judgment directly. However, once [plaintiff] prove[s] up the amount of the company's liability as a result of the contractual breach, [she] will have a meaningful remedy under 735 ILCS 5/2--1402 against directors who received distributions from PBS One. See Kennedy v. Four Boys Labor Service, 279 Ill. App. 3d 361 (2d Dist. 1996) ('Once a judgment creditor discovers assets of the judgment debtor in the hands of a third party, the trial court may order the third party to deliver up those assets to satisfy the judgment')."

The court disposed as follows of the motions regarding count XI against PBS One:

"The Plaintiff's motion for summary judgment against PBS One on Count XI, alleging breach of contract, is granted. PBS One's motion for summary judgment on Count XI is, accordingly, denied."

As to National Material and NM Holding, the court found the breach-of-contract claim (count IX) subsumed by the successor-liability claim (count X):

"To resolve [the breach-of-contract] dispute, which is the subject of the parties' motions for summary judgment on count IX, additional context as to the ownership of the entities involved in this case is necessary. That context is provided in the ensuing discussion of whether National Material is liable based on other principles of successor liability--the subject of count X--which the court finds it is.

As the Illinois Supreme Court has written, the 'well-settled general rule is that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferee corporation.' Vernon v. Schuster, 179 Ill. 2d 338, 344-45 (1997). However, courts apply exceptions to this rule in cases where:

(1) there is an express or implied agreement of assumption;

(2) the transaction amounts to a consolidation or merger of the purchaser or seller corporation;

(3) the purchaser is merely a continuation of the seller; or

(4) the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. [Vernon, 179 Ill. 2d at 345]."

The trial court found that exceptions (1) and (3) were met here. Exception (3) was met because "National Material was merely a continuation of [PBS One]." The court explained:

"As Cyrus Tang's three signatures on the [Assumption Agreement] plainly document, [PBS One] and the general partner of National Material, CT One, shared a common officer: Tang. Moreover, Tang owned and/or controlled all of the entities through which the various transfers occurred ***."

The court constructed this chart to show the commonality of ownership and control among the various entities:

| Entity | Tang's Relationship |
| --- | --- |
| PT Enterprises | "Controlling shareholder" |
| PBS One | "Sole shareholder and director" |
| Pielet LP | "Controlling shareholder by virtue of his 51% stake in PT Enterprises, which was [Pielet LP's] general partner, and his (via PBS One's) 49.5% stake in [Pielet LP]" |
| NM Holding | "Sole shareholder" |
| National Material | "Controlling shareholder by virtue of his control of NM Holding, which is National Material's general partner, possessing a 1% interest; Tang is also the Chairman and President of Tang Industries, which possesses the remaining 99% limited partnership interest in National Material." |

The court inferred from this scheme of control and ownership:

"The transaction conveying the limited partnership interest in [Pielet LP] from [PBS One] to National Materials [sic] is, essentially, a reorganization of Tang's business interests. While this reorganization may have served legitimate business purposes, regarding the Consulting Agreement it represents nothing more than [PBS One] 'putting on a new coat.' [Citation.]"

Responding to National Material and NM Holding's arguments, the court observed that the "mere continuation" exception to the general bar on successor liability does not require that "any particular business operation continue as it did before," and hence, the fact that PBS One was simply a holding company was immaterial as long as its "role as a holding company was continued by National Material." The court also rejected the contention that the "mere continuation" exception requires a court to "find an intent to defraud," as there is a separate exception for fraud.

The court then held that exception (4), the fraud exception, was not met here as a matter of law:

"Conceivably, the transactions made and the various entities created, renamed, reorganized and dissolved were done for legitimate business purposes. The truth of the proposition can be contested at trial on the remaining counts."

"Finally," the court noted, "it is necessary to return to *** whether the [Assumption Agreement] constitutes an assumption by National Material of the Consulting Agreement." The court went on:

"In light of the fact that all of the entities referenced in the [Assumption Agreement] were owned or controlled by Tang, the court finds as a matter of law that the [Assumption Agreement's] language, stating National Material 'does hereby accept and assume PBS's right, title[,] interest[,] and obligations in *** [PBS One's] limited partnership interest' is properly construed to include the Consulting Agreement."

The court turned again to count IX and held, based on the Assumption Agreement, that National Material and NM Holding were liable not only for breach of contract (count IX) but also under successor liability based on implied or express assumption (count X). The court did not address

plaintiff's remaining contention that there was successor liability because PBS One merged with National Material.

On August 2, 2007, the trial court set damages in the amounts of (1) $1,180,832.97, representing 109 outstanding payments under the Consulting Agreement of $10,833.33 each; and (2) $268,275.63 in prejudgment interest. The court assessed these damages "jointly and severally" against "each Defendant found liable on summary judgment under the respective Count or Counts against it."

## IV. Arguments on Appeal

## A. PBS One and Tang

Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2--1005(c) (West 2008). In considering a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. Land v. Board of Education, 202 Ill. 2d 414, 433 (2002). "Although summary judgment aids in the expeditious disposition of a lawsuit, it is a drastic measure and should be granted only if the moving party's right to judgment is clear and free from doubt." Land, 202 Ill. 2d at 432. "A motion for summary judgment does not ask the court to try a question of fact, but to determine if a question of material fact exists that would preclude the entry of judgment as a matter of law." Land, 202 Ill. 2d at 432. While "the nonmoving party is not required to prove his case in response to a motion for summary judgment, he must present a factual basis that would arguably entitle him to judgment." Land, 202 Ill. 2d at 432. "A motion for a summary judgment should be denied if the facts in the record present more than one conclusion or inference,

including one unfavorable to the movant." Hahn v. Union Pacific R.R. Co., 352 Ill. App. 3d 922, 929 (2004). We review de novo the trial court's grant or denial of summary judgment. Hahn, 352 Ill. App. 3d at 929.

We begin with PBS One and Tang's arguments in favor of reversing the trial court's judgment on count XI. As an initial matter, we note that PBS One and Tang do not argue that PBS One never assumed an obligation under the Consulting Agreement[8]; rather, their argument is solely that plaintiff has no cause of action against PBS One for the cessation of payments by another entity, which occurred years after PBS One was dissolved. PBS One and Tang propose two reasons: (1) after PBS One signed the Purchase Agreement and Assignment Agreement, there was a novation by which Pielet LP or its successor, Midwest Metallics, substituted itself for PBS One under the Consulting Agreement; and (2) plaintiff's claim against PBS One did not accrue until after PBS One dissolved, and therefore it fails by operation of the Survival Statute.

The reason we stress what PBS One and Tang have not argued is that, in their briefs in appeal No. 2--02--0242, National Material and NM Holding state: "[I]f this Court deems PBS One not contractually liable to the plaintiff under the [Consulting Agreement], then National Material and NM Holding would have no successor corporate responsibility." This would depend on why we deemed "PBS One not contractually liable." If we held that PBS One was never obligated under the Consulting Agreement, then a fortiori National Material and NM Holding would have incurred no duties under the Consulting Agreement when the Assumption Agreement between PBS One and National Material was signed in December 1990. PBS One and Tang, however, do not ask us to

---

[8]At oral argument, counsel for PBS One and Tang said: "In terms of PBS One, the documents are the documents, the Consulting Agreement was mentioned in the documents there."

determine whether PBS One was bound in the first instance. Essentially, their argument is, whatever obligations PBS One may have had under the Consulting Agreement prior to its dissolution in 1994, PBS One was not liable for the cessation of payments in 1998, several years after PBS One dissolved. We resolve that issue by assuming, without deciding, that PBS One assumed Pielet Corp.'s obligations under the Consulting Agreement in April 1988. Of the points that PBS One and Tang do argue, only the novation argument would also bear upon the liability of National Material and NM Holding. We could accept the Survival Statute argument yet hold National Material liable because the transfer to it (in 1990) occurred before PBS One's dissolution (in 1994).

We address first PBS One and Tang's argument that the trial court misconstrued the Survival Statute. That provision preserves, for five years following a corporation's dissolution, "any right or claim existing, or any liability incurred, prior to such dissolution." 805 ILCS 5/12.80 (West 2008). The trial court held that plaintiff could sue on the Consulting Agreement, because "[Arthur and plaintiff] had an existing right to payment from PBS One prior to the company's dissolution, since PBS One assumed the Consulting Agreement prior to that date." Plaintiff's suit was permitted under the Survival Statute even though plaintiff's "legal claim to enforce [her] right [under the Consulting Agreement] did not accrue" until after PBS One was dissolved.

PBS One and Tang argue that the Survival Statute is more properly construed as preserving only causes of action that accrue prior to the dissolution of the corporation. Plaintiff agrees that her cause of action did not accrue until after PBS One dissolved, but asserts that it is enough for the Survival Statute that PBS One had an "existing liability" under the Consulting Agreement before PBS One was dissolved. The parties present us with a question of statutory interpretation, which,

like a challenge to the grant or denial of a motion for summary judgment, is a question of law to be reviewed de novo. In re Estate of Gagliardo, 391 Ill. App. 3d 343, 346 (2009).

The fundamental goal for a court interpreting a statute is to give effect to the legislature's intent, and the best indicator of that intent is the statute's language, given its plain and commonly understood meaning. Gagliardo, 391 Ill. App. 3d at 346. The operative language of the Survival Statute, which as noted allows the survival of "any right or claim existing, or any liability incurred" prior to a corporation's dissolution (805 ILCS 5/12.80 (West 2008)), largely forecloses PBS One and Tang's position that the statute applies only to "causes of action" that accrue prior to dissolution. That the legislature stated that the Survival Statute applies to save any right "or" claim "or" any liability incurred prior to dissolution compels the inference that the legislature intended those terms to be viewed in the alternative. See Webb v. County of Cook, 275 Ill. App. 3d 674, 678 (1995) (interpreting legislature's use of the word "or"). Indeed, any other interpretation would have the unsavory effect of rendering superfluous much of the quoted statutory language, so that a list of three items would be understood to refer to but one situation. We cannot conclude that the legislature intended such a redundancy. See Bonaguro v. County Officers Electoral Board, 158 Ill. 2d 391, 397 (1994) ("Statutes should be construed, if possible, so that no term is rendered superfluous or meaningless"). Instead, we must conclude that the legislature intended the Survival Statute to apply to preserve corporate obligations of three distinct types: "claims," "rights," and "liabilities."

To support their argument that the reach of the Survival Statute should be limited to causes of action that accrued prior to dissolution, and not to rights or liabilities existing prior to dissolution but not abridged until after dissolution, PBS One and Tang direct us to several court decisions applying the Survival Statute. All of those cases, however, describe the Survival Statute's

application to causes of action. As the trial court noted, regardless of whether plaintiff's "cause of action" accrued after PBS One's dissolution, a "right" to payment (or PBS One's "liability" to pay) under the Consulting Agreement existed prior to the dissolution. Since this case involves a "right" or "liability" and not a "cause of action" under the Survival Statute, our outcome here is not controlled by case law limiting the types of causes of action that may be brought against a dissolved corporation. See Beals v. Superior Welding Co., 273 Ill. App. 3d 655, 660 (1995) ("no valid cause of action which accrues after dissolution may be brought against a dissolved corporation"); Blankenship v. Demmler Manufacturing Co., 89 Ill. App. 3d 569 (1980) (plaintiff could not bring cause of action for strict liability against corporation for injury that occurred after corporation's dissolution, because no Illinois statute provided for such an action). We agree with PBS One and Tang that the above cases stand for the proposition that the Survival Statute allows a party to assert a cause of action against a dissolved corporation only if the cause of action accrued before the dissolution. However, since this case involves plaintiff's assertion of a "right" or "liability" existing prior to PBS One's dissolution, not a "cause of action" existing prior to dissolution, we disagree that the above cases guide us here.

Our interpretation fits squarely with the purpose of the Survival Statute. The Survival Statute, and statutes like it in several other states (see 19 Am. Jur. 2d Corporations §2418, at 514 (2004) (corporate survival statutes have been enacted "in virtually all jurisdictions")), are a response to the common-law rule that a corporation's dissolution immediately terminated its legal existence (Blankenship, 89 Ill. App. 3d at 572), just as a death would end a natural person's legal existence (J. Belcastro, Post-Dissolution Rights of Corporations: What Survives the Survival Statute?, 89 Ill. B.J. 120, 121 (March 2001) (hereinafter Belcastro)). Under the common-law rule, "[o]nce dissolved, [a]

corporation could neither sue nor be sued, and even pending proceedings were abated." Blankenship, 89 Ill. App. 3d at 572; see also Poliquin v. Sapp, 72 Ill. App. 3d 477, 481 ("At common law, a corporation's capacity to sue and be sued terminated when the corporation was legally dissolved"); Belcastro, 89 Ill. B.J. at 121 ("Dissolution utterly destroyed the right to pursue legal proceedings by or against the corporation such that even pending proceedings spontaneously abated"). The consequences of this rule were harsh for corporate creditors and shareholders alike. Belcastro, 89 Ill. B.J. at 121 ("Overwhelmingly, the detrimental impact of the abrupt termination of a corporation's life fell upon the corporation's creditors and shareholders"); cf. 19 Am. Jur. 2d Corporations §2418, at 514 (2004) (statutes allowing winding up of corporate affairs were enacted to "protect the creditors and stockholders *** in the process of liquidation"). For creditors, a corporation's dissolution left them suddenly with no recourse to satisfy their claims, as all corporate debt was extinguished upon the termination of the corporate existence. 19 Am. Jur. 2d Corporations §2419, at 516 (2004). For shareholders, a corporation's dissolution left them with no means to pursue a corporation's personal property, which escheated to the State, or its real property, which devolved to the grantors. Consolidated Coal Co. v. Flynn Coal Co., 274 Ill. App. 405, 411 (1934) ("There is no dispute that by the common law doctrine of the status of a corporation after its dissolution for any cause, the corporation has no legal existence, and the real estate held by [it] reverts to the grantors or donors, and the personal property escheats to the king, and that no right of action can be maintained to enforce a claim against [it]"); 19 Am. Jur. 2d Corporations §2419, at 516 (2004).

The first solution to this problem came via the equitable theory known as the trust fund doctrine. 19 Am. Jur. 2d Corporations §2419, at 515 (2004); see Blankenship, 89 Ill. App. 3d at 572

("[t]he trust fund doctrine was promulgated by the equity courts to protect creditors when dissolution occurs"). Under this theory, "notwithstanding the dissolution of [a] corporation, its assets belong to [its shareholders], and are treated in equity as a trust fund, to be administered for the benefit of the <u>bona fide</u> holders of stock, subject to the just claims of creditors of the corporation." <u>Wheeler v. Pullman Iron & Steel Co.</u>, 143 Ill. 197, 204 (1892). This trust fund doctrine supplanted the old common-law rule. See <u>Gulf Lines Connecting R.R. of Illinois v. Golconda Northern Ry.</u>, 290 Ill. 384, 392 (1919) ("[e]ven in case of a dissolution of a corporation, the common law doctrine that upon such dissolution there remains no owner of the property is obsolete, and the assets of the corporation will be administered, subject to the rights of creditors, for the benefit of the stockholders"), citing <u>Wheeler</u>, 143 Ill. 197.

Corporate survival statutes, such as the Survival Statute at issue here, represent another, more comprehensive part of the solution to the problem of sudden corporate dissolution. See <u>Consolidated Coal Co.</u>, 274 Ill. App. at 411 ("this common law doctrine has been so modified that the property of a dissolved corporation is to be used for the benefit of the creditors and stockholders after dissolution, and generally, by a saving clause, stockholders or creditors may maintain an action for that purpose, and in order to maintain an action it must be filed within the time fixed for such purpose"); <u>Consolidated Coal Co.</u>, 274 Ill. App. at 409 (quoting Ill. Rev. Stat. 1929, ch. 32, par. 79, a precursor to the Survival Statute).

The Survival Statute does several things to change the common-law rule. First, "[o]ne of the main purposes of the survival statute is to extend the life of a corporation for [the statutory period] following dissolution so that suits which ordinarily would have abated may be brought by and against the corporation." <u>Blankenship</u>, 89 Ill. App. 3d at 574. At the same time, by setting a definite

-31-

time after which a dissolved corporation will cease to exist, the Survival Statute avoids the problem of open-ended corporate liability that some authority had ascribed to the trust fund doctrine. See Blankenship, 89 Ill. App. 3d at 574 ("we believe that the survival statute reflects a legislative intent to establish a definite point in time when a corporation ceases to exist"); see also Moore v. Nick's Finer Foods, Inc., 121 Ill. App. 3d 923, 925 (1984) ("the general policy behind the corporate dissolution statute is to set a definite point in time at which the existence of a corporation and the transaction of its business are terminated"). Thus, the Survival Statute defers the corporation's termination date and extends the life of a dissolved corporation so that it may wind up its affairs. 13 Ill. L. & Prac. §350, at 626 (2000), citing In re Morris, 171 B.R. 999 (Bnkr. S.D. Ill. 1993).

Once a corporation has been dissolved, and once the survival period has thus begun, the corporation may no longer "carry on any business except that necessary to wind up and liquidate its business and affairs." 805 ILCS 5/12.30 (West 2008). The corporation's activities during this "winding up" period are limited to those necessary to close the business, satisfy any creditors, and devolve its remaining assets to its shareholders. See 19 Am. Jur. 2d Corporations §2424, at 519 (2004) ("The corporation's powers" during the winding-up period "merely extend to those necessary to hold and dispose of its property, collect its assets, and discharge its obligations"). (To the extent a corporation continues conducting its business after dissolution, such as by entering into new contracts, the corporate officer responsible may be held personally liable on the contract. Forsythe-Fournier v. Isaacson, 368 Ill. App. 3d 674, 676-77 (2006).) The dissolved corporation may, however, fulfill its preexisting obligations as it works to close the business. See Isaacson, 368 Ill. App. 3d 674 (corporation could fulfill contract to install an air-conditioning system even though the corporation dissolved before the installation was complete).

A corporation's debts (and rights) extend into the survival period (19 Am. Jur. 2d Corporations §2450, at 538 (2004) ("Dissolution does not extinguish a corporation's debts")); indeed, as explained above, the policy favoring satisfaction of a dissolved corporation's outstanding debts is the very reason for the Survival Statute. Thus, since the corporation's debts and obligations persist into the survival period, and since the corporation continues to exist during the survival period, a corporation or its creditors may assert claims regarding those debts and obligations during the survival period. However, once the survival period has ended, the corporation ceases to exist. Since the corporation at that point no longer exists, it can no longer be subject to any claim, and any claims not raised against or by the corporation become forfeited.

This overview of the purpose of the Survival Statute, and the context that bore it, very clearly refutes PBS One and Tang's position that a party may recover from a dissolved corporation only if the party had a cause of action that accrued against the corporation before dissolution. The policy underlying the Survival Statute demonstrates that it was meant to preserve creditors' rights to collect on any outstanding corporate obligation, even if the corporation had not breached its obligation at the time of dissolution.

This overview also brings us into discord with one decision PBS One and Tang cite in their briefs. In Cornick v. High Grade Cleaners, Inc., 595 F. Supp. 718 (N.D. Ill. 1984), the plaintiff union trustees sought to recover from the defendant corporation for its failure to make scheduled pension and welfare plan payments for a six-month period in the two years following its dissolution. The plaintiffs argued that the Survival Statute permitted their claim, which they filed within the statutory period. The court rejected the plaintiffs' argument as follows:

"However, the [Survival Statute] permits suits only for causes of action which accrued <u>before</u> the corporation was dissolved. [Citation.] In this case, the [plaintiffs'] cause of action did not accrue until [approximately one year after the defendant's dissolution]. Thus, the [Survival Statute] is inapplicable to this situation ***." <u>Cornick</u>, 595 F. Supp. at 720.

<u>Cornick</u>'s limited discussion of the Survival Statute indeed supports PBS One and Tang's view that the Survival Statute applies only to causes of action, and not to any rights or liabilities existing prior to dissolution. However, the cursory discussion also entirely overlooks the Survival Statute's language and its purpose, both of which extend the statute to allow recovery not just for accrued causes of action, but also for corporate debts and liabilities existing prior to dissolution. We therefore decline to follow <u>Cornick</u>.

Our reading of the purpose of the Survival Statute also puts us at odds with our decision in a case the parties do not cite, <u>Henderson-Smith & Associates, Inc. v. Nahamani Family Service Center, Inc.</u>, 323 Ill. App. 3d 15 (2001). In <u>Henderson-Smith</u>, the plaintiff corporation had entered into a contract with the defendant to perform accounting services, including year-end audits, for a specific fee. <u>Henderson-Smith</u>, 323 Ill. App. 3d at 17. Approximately 17 months after the start of the contract, the plaintiff was administratively dissolved, but it continued to perform accounting services for the defendant. On appeal, we rejected the notion that the plaintiff's cause of action was preserved by the Survival Statute. <u>Henderson-Smith</u>, 323 Ill. App. 3d at 20.[9]

As in the <u>Cornick</u> decision, <u>Henderson-Smith</u>'s discussion of the Survival Statute was quite limited. After quoting the statute, the court in <u>Henderson-Smith</u> devoted but one sentence to its

---

[9]Although the court in <u>Henderson-Smith</u> rejected the Survival Statute as a basis for the plaintiff to bring suit, it ultimately allowed the plaintiff's cause of action on the ground that the plaintiff's reinstatement as a corporation allowed retroactive recovery.

application of the Survival Statute to the case at hand: "On the date that [the plaintiff] was dissolved the cause of action had not yet accrued and therefore there could not be a cause of action pending." Henderson-Smith, 323 Ill. App. 3d at 20. To the extent the discussion in Henderson-Smith implies that the Survival Statute allows postdissolution claims only for causes of action that accrued before dissolution, and not for causes of action that accrued later based on rights or liabilities that existed prior to dissolution, we do not follow the decision. Instead, we agree with the trial court that the Survival Statute applies to rights and liabilities, not just causes of action, existing prior to a corporation's dissolution. Accordingly, we agree with the trial court that the Survival Statute allowed a cause of action based on the Consulting Agreement to be brought against PBS One within five years of PBS One's dissolution.

PBS One and Tang also argue that, even if Arthur's right to payment from PBS One could be enforced under the Survival Statute against PBS One, plaintiff's right to payment cannot be so enforced. To support this argument, PBS One and Tang assert that any right to payment plaintiff had was contingent--on her becoming Arthur's widow--at the time of PBS One's dissolution. Thus, PBS One and Tang reason, plaintiff had no existing right (nor PBS One any existing liability to her) when PBS One was dissolved, and PBS One's liability under the Consulting Agreement ended with Arthur's death. We disagree.

Even if we were to accept PBS One and Tang's position that plaintiff's right to payment from PBS One was contingent at the time of PBS One's dissolution, she possessed that contingent right (and PBS One had that contingent liability) at the time of PBS One's dissolution. After a corporation's dissolution, "[a] creditor whose claim is contingent is entitled to the same consideration and protection as a creditor whose claim is certain." 19 Am. Jur. 2d Corporations §2453, at 540

(2004). Thus, "[a]lthough it is not necessary for a corporation to satisfy its contingent liabilities upon dissolution, a corporation is required to make provision for the discharge of such liabilities before distributing its remaining assets to its shareholders." 19 Am. Jur. 2d Corporations §2453, at 540 (2004); cf. H.H. Evans v. Illinois Surety Co., 220 Ill. App. 199, 211 (1920) (under statute allowing dissolved insurance corporations to continue existence for two years for sole purpose of winding up, "a time must be fixed for the distribution of assets, *** and *** when so fixed contingent claims must necessarily be excluded, but we think under these statutes [a court order] may not fix a time for exclusion at less than 2 years from *** the date of the dissolution of the corporation"). Plaintiff's supposedly contingent interest in payment under the Consulting Agreement enjoys the same protection under the Survival Statute as did Arthur's right to payment. The parties do not dispute that plaintiff raised her claim to payment within the five-year period specified in the Survival Statute. Thus, the Survival Statute allows her claim.

PBS One and Tang also argue that PBS One cannot be held liable on the Consulting Agreement because their liability was not reasonably foreseeable. See, e.g., Cencula v. Keller, 180 Ill. App. 3d 645, 650 (1989) (damages are recoverable for breach of contract only where they result naturally from the breach or are the consequence of circumstances within the parties' reasonable contemplation at the time of the contract). PBS One and Tang contend that the damages here were not foreseeable by PBS One because PBS One was never asked to pay under the Consulting Agreement and in fact was not an original party to the agreement. Neither of these assertions, however, affects the fact that the original parties to the agreement, which PBS One at one time took responsibility for, contemplated that Arthur and plaintiff would receive payment. The damages now asserted--the withheld payments--are the most natural and foreseeable consequences possible of a

breach of the agreement. We therefore reject PBS One and Tang's foreseeability argument, and we move to their next argument.

The above discussions regarding the Survival Statute and foreseeability assume that PBS One retained the obligation to pay Arthur under the Consulting Agreement. However, PBS One and Tang also challenge the trial court's summary judgment ruling by arguing that the obligation passed from PBS One via a novation between Arthur and Pielet LP. PBS One and Tang observe that Michael Zavis's affidavit and deposition testimony show that he and Arthur understood that "upon the [1988] restructuring, Pielet Inc. [would be] effectively discharged from its obligations under the [Consulting Agreement], thereby obligating Pielet LP to substitute under the agreement." That understanding was borne out by subsequent events, claim PBS One and Tang, because payments under the Consulting Agreement came from Pielet LP and later from Midwest Metallics, and Arthur accepted them. PBS One and Tang argue that, "based *** upon Arthur accepting payments without question for over 10 years from Pielet LP, a novation was effectuated, and PBS One was effectively never in [the] chain of assignment." PBS One and Tang contend that, if we do not find novation as a matter of law, we should at least conclude that material fact questions exist on the novation issue so as to preclude summary judgment in plaintiff's favor.[10] "Novation is the substitution of a new debt or obligation for an existing one, which is thereby extinguished." First Midwest Bank v. Thunder Road,

---

[10]Incidentally, there is no merit to plaintiff's argument that, by themselves moving for summary judgment, PBS One and Tang, and National Material and NM Holding, are estopped from arguing the existence of a material fact question. "[M]erely because the parties have filed cross-motions for summary judgment, and many of the facts are undisputed, does not compel the conclusion that there are no triable issues of fact in the case." Danada Square, LLC v. KFC National Management Co., 392 Ill. App. 3d 598, 607 (2009).

Inc., 359 Ill. App. 3d 921, 924 (2005). "The elements of novation are: (1) a previous valid obligation; (2) a subsequent agreement by all of the parties to the new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract." First Midwest Bank, 359 Ill. App. 3d at 924. "It must be shown that all parties to both [the] old and new agreements intended to substitute the new agreement for the old." Alton Banking & Trust Co. v. Schweitzer, 121 Ill. App. 3d 629, 634 (1984). "The intention of the parties may be inferred from the circumstances or actions of the parties." Schweitzer, 121 Ill. App. 3d at 634.

PBS One and Tang's exact argument on novation is somewhat difficult to pinpoint. At times, PBS One and Tang appear to argue that the novation occurred in April 1988 when Pielet LP was formed and that Arthur's acceptance of payments from Pielet LP and, later, Midwest Metallics was simply corroborative of Arthur's understanding in 1988, before the restructuring, that Pielet LP would substitute for Pielet Corp. An alternative construal, however, is that PBS One and Tang are arguing that Arthur's acceptance of payments from Pielet LP and Midwest Metallics effected the novation. As for their assertion that PBS One "was effectively never in [the] chain of assignment" (emphasis added), this would be the case only if the novation occurred before PBS One assumed a one-half interest in the obligations of Pielet Corp., but neither of the novation scenarios put forth by PBS One and Tang has the substitution occurring this early.

We disagree with the trial court that there is no genuine issue of material fact on the issue of novation. A triable fact question exists, we believe, on whether a novation occurred, either in April 1988 when Pielet LP was formed or later by virtue of Arthur's continued acceptance of payments from Pielet LP and Midwest Metallics.

We address first the possibility that the novation occurred in April 1988. The record is unclear as to the nature of the transactions in April 1988 between PBS One and Pielet Corp. on the one hand and Pielet LP on the other. A novation would require the assent of PBS One and Pielet Corp. as the original debtors or obligors. Alton Banking & Trust Co., 121 Ill. App. 3d at 635 (original guarantor on bank loan did not consent to substitution of new guarantor). The trial court found it undisputed that "both Pielet Corp. and PBS One conveyed their respective one-half interests [in the assets and liabilities of Pielet Corp.] to [Pielet LP] in exchange for a 49.5% limited partnership interest in that entity." Just what this transfer effected is uncertain. Zavis, who represented Pielet Corp. in the April 1988 transactions, gave contradictory statements on whether Pielet LP substituted as obligor under the Consulting Agreement or simply accepted an assumption or assignment of liability under the Consulting Agreement. "An important distinction between an assignment, a delegation, and a novation is whether one of the original parties remains obligated under [the] contract." Petals Factory Outlet of Delaware, Inc. v. EWH & Associates, 90 Md. App. 312, 319, 600 A.2d 1170, 1174 (1992). "The distinction between novation and assignment is clear; in novation the obligation between the original parties to the contract is completely extinguished, and a new obligation between the transferee and obligor is created and substituted for the previous one; while, after assignment, the obligation of the original debtor may continue to rest upon him, and he may be compelled to respond in the event of the default of the assignee." Harrison v. Fregger, 88 Mont. 448, 453-54, 294 P. 372, 373 (1930); see also Thomas v. Frederick J. Borgsmiller, Inc., 155 Ill. App. 3d 1057, 1061 (1987) ("Assuming there was a valid assignment of the lease ***, we find that the facts still support the trial court's conclusion that there was no novation").

In his affidavit, Zavis stated that he told Arthur that Pielet LP "was assuming [Pielet Corp.'s] obligations under the Consulting Agreement" (emphasis added). As noted, an assumption or assignment leaves the original obligor liable for the obligation. In the same sentence, however, Zavis wrote that Pielet LP was "substituting itself for [Pielet Corp.]" (emphasis added). Zavis went on to assert "that [Pielet Corp.] would no longer be obligated to [Arthur] under the Consulting Agreement, and that [Pielet LP] would thereafter have such obligation." This is the language of novation. However, in his deposition, Zavis testified that, by the transfer of interests from Pielet Corp. and PBS One to Pielet LP, the former simply "assumed" the obligation under the Consulting Agreement and that Zavis never intended, nor was he asked, to secure a release from Pielet Corp. of its liability under the Consulting Agreement.

The remainder of the record does not settle whether the arrangement between Pielet Corp., PBS One, and Pielet LP was an assumption or a novation. In fact, we have found no document in the record that purports to effect the transfer of interests from Pielet Corp. and PBS One to Pielet LP. The only transfers the Partnership Agreement itself appears to contemplate are capital contributions of $6 million from each limited partner and $121,000 from the general partner. Indeed, the only document that appears to substantiate the transfer of interests is the April 12, 1988, letter from Tang to Pielet Corp. directing it, "[p]ursuant to the Partnership Agreement, *** to transfer to the Partnership the undivided one-half (½) interest in and to all of the Company's Assets purchased by [PBS One]." "Assets," however, is not defined in the letter.

We note that, while Zavis apparently represented only Pielet Corp. in the April 1988 transactions, both his affidavit and deposition testimony mentioned that PBS One held a 50% undivided interest in the liabilities of Pielet Corp. Thus, his deposition testimony that the April 1988

transactions were not intended to release the "original entity," that is the original obligor, under the Consulting Agreement may reasonably be taken to apply to PBS One as co-obligor under the Consulting Agreement. Moreover, PBS One and Pielet Corp. are jointly mentioned in all documents that pertain to the formation of Pielet LP, and there is no reason to believe that PBS One was in a different posture after the April 1988 transactions than Pielet Corp. We conclude that there remains a material fact question whether the original obligors, Pielet Corp. and PBS One, intended a novation by the 1988 transactions.

There is also the question of Arthur's assent as creditor or obligee under the Consulting Agreement. In his affidavit, Zavis stated that, after informing Arthur that subsequent payments under the Consulting Agreement would be made by Pielet LP and that "[Pielet Corp.] would no longer be obligated to him under the Consulting Agreement," Arthur "agreed thereto." While Arthur may have intended to release Pielet Corp., it is unclear, as we have noted, whether Pielet Corp. and PBS One themselves intended to be released. Even if the issue of Pielet Corp.'s and PBS One's assent did not itself preclude summary judgment, we would still find summary judgment inappropriate because there is a fair question whether Arthur assented to a novation. Plaintiff disputes that Zavis's affidavit is relevant at all to Arthur's intent concerning PBS One as opposed to Pielet Corp. She denies that Arthur could have assented in 1988 to a novation in favor of PBS One. She notes that Zavis mentioned having spoken to Arthur about only Pielet Corp., not PBS One. Plaintiff further claims that it was only after she and Arthur filed suit in 1998 that they discovered "PBS One's involvement" in the events at issue. For support, she cites the first page of her initial complaint in this action. The complaint indeed does not name PBS One, but this alone does not establish that Arthur was unaware of PBS One in 1988. Moreover, though Arthur's assent to a

novation in favor of PBS One is not explicit from Zavis's affidavit, it is undisputed that Arthur subsequently accepted payments from Pielet LP and Midwest Metalics, and the record raises a genuine issue whether Arthur did so while aware that Pielet Corp. and PBS One (or its successor(s)) were bound by the Consulting Agreement.

Discounting the significance of Arthur's acceptance of payments from a source other than Pielet Corp. and PBS One, plaintiff points to the following principles:

"Whether a novation has occurred depends upon the intention of the parties, and the assent of a creditor to the novation may be express or implied from the facts and circumstances attending the transaction or from the subsequent conduct of the creditor. However, the fact that a creditor has knowledge of the assumption of his debtor's obligation by a third person does not necessarily establish such assent. Nor does partial payment of the debt by the third person to the creditor, alone or in combination with the creditor's knowledge of the third person's assumption of the debtor's obligation, constitute a novation as a matter of law or necessarily establish such assent on the part of the creditor. [Citation.] When a third party contracts with a debtor to assume his obligation and perform it in his stead, the mere acquiescence in such an assumption by the creditor is not an assent to a novation, nor is his mere acceptance of a part payment made by the third party. [Citation.]" (Emphasis added.) Frederick J. Borgsmiller, 155 Ill. App. 3d at 1061-62.

While we agree with plaintiff that Arthur's acceptance of payments from Pielet LP does not establish a novation as a matter of law, we believe this conduct of Arthur, combined with Zavis's account of their meeting, raises a material question of fact as to whether Arthur assented to a novation in favor

of PBS One and Pielet Corp. As we explain below, these considerations are equally relevant to the novation argument raised by National Material and NM Holding.

We also comment on PBS One and Tang's argument that the trial court erred by, as they claim, "declaring Cyrus Tang personally liable for" damages under the Consulting Agreement. It is questionable whether the trial court did actually enter judgment against Tang himself. In its August 2, 2007, order on damages, the court assessed damages against "each Defendant found liable on summary judgment under the respective Count or Counts against it." The judgment line in the trial court's August 31, 2006, order on summary judgment states in part: "Plaintiff's motion for summary judgment against PBS One on Count XI, alleging breach of contract, is granted" (emphasis added). Since Tang is not mentioned, it is reasonable to conclude that he was not one of the defendants "found liable under the *** Counts." Thus, the court's comment in the August 31, 2006, order that, once plaintiff proves the damages assessable against PBS One, she "will have a meaningful remedy under 735 ILCS 5/2--1402 against directors who received distributions from PBS One," likely was just a tip to plaintiff that there was a means of obtaining relief against Tang himself for PBS One's breach.

The court really could do no more since it was plaintiff's responsibility to initiate proceedings against Tang if she wished, and she would have had to utilize the procedure under section 2--1402 of the Code of Civil Procedure (735 ILCS 5/2--1402 (West 2008)), which "provides a mechanism by which a judgment creditor may initiate supplemental proceedings to discover assets of a judgment debtor in the possession of a third party and apply those assets to satisfy the judgment." Tobias v. Lake County Partners, LLC, No. 1--09--1054, slip op. at 7 (June 22, 2010); see 134 Ill. 2d R. 277(a) (supplementary proceedings under section 2--1402 "may be against a judgment debtor or any third

party the judgment creditor believes has property of or is indebted to the judgment debtor"). Section 2--1402(a) provides that "[t]he procedure for conducting supplementary proceedings shall be prescribed by rules." 735 ILCS 5/2--1402(a) (West 2008). It is Supreme Court Rule 277 (134 Ill. 2d R. 277) that "prescribes the procedure for implementation of the supplementary proceedings provided for in section 2--1402." Tobias, slip op. at 7. Rule 277(b) states that the "supplementary proceeding[s] shall be commenced by the service of a citation on the party against whom it is brought." 134 Ill. 2d R. 277(b).

As PBS One and Tang note, no proceedings under section 2--1402 have been commenced against Tang, whom the trial court evidently believed was (for purposes of the judgment on count XI) a third party in whose possession might be the (former) assets of PBS One. To the extent that the trial court meant to enter a judgment against Tang pursuant to section 2--1402, that judgment was questionable because no citation was filed against Tang. Of course, since we hold that summary judgment for plaintiff and against PBS One on count XI was improper in any event, we need not reach any holding on the separate issue of Tang's liability.

To summarize, we hold that the Survival Statute preserves plaintiff's breach of contract claim against PBS One. Since, however, material questions of fact exist as to whether a novation occurred in favor of PBS One, summary judgment for plaintiff on count XI was improper. Moreover, since questions of material fact currently preclude a finding that PBS One is liable for breach of contract, we do not address whether there was a basis for holding Tang personally liable for the breach.

### B. National Material and NM Holding

We proceed to the arguments of National Material and NM Holding against summary judgment on counts IX and X, alleging, respectively, breach of contract and successor liability. We

begin with count IX, which alleged that, by the Assumption Agreement, National Material assumed responsibility under the Consulting Agreement. The Assumption Agreement states, in relevant part, that National Material "does hereby accept and assume [PBS One's] right, title, interest[,] and obligations in and to the extent of 100% of [PBS One's] limited partnership interest in [Pielet LP]." National Material and NM Holding do not dispute that PBS One assumed liability under the Consulting Agreement by virtue of the Purchase Agreement and Assignment Agreement. They focus, rather, on what PBS One conveyed to National Material under the Assumption Agreement.

Plaintiff, however, seeks to forestall the challenge to the trial court's judgment on count IX. She claims that National Material and NM Holding have "no defense" to the breach-of-contract claim because "[i]n January 2000, after National Material had been joined as a defendant, the circuit court ruled that a breach of the Consulting Agreement had occurred in July 1998[,] and National Material did not appeal that order." Plaintiff supplies no context by which to understand this assertion but apparently leaves it for us to discern the context from her record citation. She cites to the trial court's order of January 2000 granting summary judgment against J.P. Investments on plaintiff's count IV, "on the grounds set forth in the Plaintiff's briefs." The order cited is not self-illuminating, and we decline to comb through the record to discern how, if at all, the January 2000 ruling might impact the proceedings here. Plaintiff's argument is forfeited for lack of development. See 210 Ill. 2d R. 341(h)(7).

The trial court, in finding a breach of contract and successor liability based on an express assumption, reasoned that "obligations" as mentioned in the Assumption Agreement naturally included the Consulting Agreement. National Material and NM Holding, however, focus on the qualifying phrase "in and to the extent of *** [PBS One's] limited partnership interest in [Pielet

LP]." They argue that the Assumption Agreement by its unequivocal language conveyed only PBS One's limited partnership interest, which they emphasize is a limited-liability interest under Illinois law. National Material and NM Holding quote section 303 of the Uniform Limited Partnership Act (Partnership Act) (805 ILCS 215/303 (West 2008)), which states:

> "No liability as limited partner for limited partnership obligation. An obligation of a limited partnership, whether arising in contract, tort, or otherwise, is not the obligation of a limited partner. A limited partner is not personally liable, directly or indirectly, by way of contribution or otherwise, for an obligation of the limited partnership solely by reason of being a limited partner, even if the limited partner participates in the management and control of the limited partnership."

"The fundamental difference between the liability of general partners and limited partners *** is that the former are responsible in solido for the debts and obligations of the firm, without regard to the amounts contributed by them to the capital, while the latter is not personally liable *** because his cash contribution is substituted for personal liability." Allen v. Amber Manor Apartments Partnership, 95 Ill. App. 3d 541, 547 (1981). In this spirit, the Partnership Agreement provides: "No Limited Partner shall have any personal liability whatever, whether to the Partnership, to any of the Partners or to the creditors of the Partnership, for the debts of the Partnership or any of its losses."

A vital premise of National Material and NM Holding's argument is that the Consulting Agreement was "[a]n obligation of [the] limited partnership" (805 ILCS 215/303 (West 2008)), Pielet LP. They claim this was so because the Consulting Agreement was Pielet LP's debt, since Pielet LP "had assumed Pielet Corp.'s obligations to plaintiff under the [Consulting Agreement]." "Pielet LP had the legal obligation to make those payments," and neither Pielet Corp., PBS One, nor

their successors were so obligated. The point here appears to be that the Consulting Agreement was "an obligation of [Pielet LP]" because there was a novation in favor of PBS One and Pielet Corp.[11] We have held that a triable issue of fact exists on whether the transfer of PBS One's and Pielet Corp.'s interests to Pielet LP was a novation or simply an assumption that did not extinguish PBS One's and Pielet Corp.'s obligation under the Consulting Agreement. The novation might have occurred with the formation of Pielet LP in April 1988, or later by virtue of Arthur's acceptance of payments from Pielet LP and Midwest Metallics. Realistically, the timing of the novation would not impact the liability of National Material. If the novation occurred before the Assumption Agreement was signed in December 1990, then there was no liability for National Material to assume. Yet under any plausible scenario (at least as judged on the basis of the present undisputed facts), the novation would have occurred before payments under the Consulting Agreement ceased in July 1998 and plaintiff's cause of action arose. The timing of the novation is a matter for the fact finder. At present, the novation question precludes summary judgment on count IX.

If, however, there was no novation, and PBS One and Pielet Corp. remained liable under the Consulting Agreement, then there would still be the question of whether the Consulting Agreement was one of the "obligations" assumed by National Material per the Assumption Agreement. In the interests of judicial economy, we determine whether, as the trial court found, the Assumption Agreement reflects an intent by the parties for National Material to assume liability under the

---

[11]Plaintiff argues that National Material and NM Holding forfeited their novation argument by not raising it in the trial court. We disagree. Though National Material and NM Holding did not expressly argue novation below, a novation argument was implicit in their contention, brought below and thus preserved for appeal, that the Consulting Agreement became a debt of the partnership, Pielet LP.

Consulting Agreement. The primary goal in interpreting a contract is to ascertain and give effect to the intent of the parties. McHenry Savings Bank v. Autoworks of Wauconda, Inc., 399 Ill. App. 3d 104, 111 (2010). The best indicator of the parties' intent is the contract language itself, given its plain and ordinary meaning. Hensley Construction, LLC v. Pulte Home Corp., 399 Ill. App. 3d 184, 192 (2010). The parties do not dispute that PBS One assumed one-half of Pielet Corp.'s liabilities, including the Consulting Agreement, and that (as the trial court phrased it) "both Pielet Corp. and PBS One conveyed their respective one-half interests to [Pielet LP] in exchange for a 49.5% limited partnership interest in that entity." It is reasonable to conclude that (1) PBS One's obligation under the Consulting Agreement became part of its limited partnership interest in Pielet LP; and (2) the limited partnership interest was assigned wholesale to National Material, under the provisions in the Assumption Agreement that "[PBS One] *** assign[s] to [National Material] one hundred percent (100%) of [PBS One's] limited partnership interest in [Pielet LP]" and that "[National Material] *** accept[s] and assume[s] [PBS One's] right, title, interest[,] and obligations in and to the extent of 100% of [PBS One's] limited partnership interest in [Pielet LP]."

National Material and NM Holding argue that liability under the Consulting Agreement was not assumed by National Material because the Consulting Agreement was not specified in the Assumption Agreement as one of PBS One's "obligations." They cite, however, no canon of contractual interpretation that would bar us from according the phrase, "in and to the extent of 100% of [PBS One's] limited partnership interest in [Pielet LP]," the inclusiveness it plainly conveys. This interpretation, not National Material and NM Holding's, gives effect to the parties' obvious intent of assigning PBS One's limited partnership interest in toto to National Material.[12]

_____

[12]As evidence that National Material acknowledged its assumption of liability under the Consulting Agreement, plaintiff

We conclude that, because the novation issue presents a genuine question of material fact that could preclude plaintiff's recovery under count IX, summary judgment on count IX was inappropriate.        For the same reasons, the novation issue bars summary judgment on count X, alleging successor liability.  Counts IX and X both assert liability based on the alleged succession of interests between PBS One and National Material, but where count IX is based on the allegedly express assumption provision in the Assumption Agreement, count X is based on a doctrine that recognizes various means, including express assumption, by which an entity may be deemed the successor of another.  As we noted, if the novation in favor of PBS One occurred before the succession of interests from PBS One to National Material, then a fortiori liability under the Consulting Agreement could not have passed to National Material.  If the novation occurred only later by virtue of Arthur's continued acceptance of payments from Pielet LP and Midwest Metallics, we suspect it would have occurred before plaintiff's cause of action arose.  Therefore, as the novation issue potentially bars recovery against National Material, summary judgment on count X was improper.

In the interests of judicial economy, we review an aspect of the trial court's ruling on count X.  Explaining the scope of our ruling first requires us to set forth the doctrine of successor liability. "The well-settled general rule is that a corporation that purchases the assets of another corporation

---

points to a memorandum from National Material executive Frank Sove to then-company president Michael Tang (son of Cyrus Tang). The memorandum is dated May 29, 1991, several months after the Assumption Agreement was signed.  According to plaintiff, the memorandum "outline[s] the interests formerly held by PBS One and assumed by National Material" and specifies the Consulting Agreement.  The Consulting Agreement is in fact listed in the memorandum, but the document purports to list not what was transferred from PBS One to National Material but what was transferred from Pielet Corp. to PBS One per the Purchase Agreement and Assignment Agreement.

is not liable for the debts or liabilities of the transferor corporation." Vernon v. Schuster, 179 Ill. 2d 338, 344-45 (1997). "The traditional rule of successor corporate nonliability 'developed as a response to the need to protect bonafide purchasers from unassumed liability.' " Vernon, 179 Ill. 2d at 345, quoting Tucker v. Paxson Machine Co., 645 F.2d 620, 623 (8th Cir. 1981). " 'To offset the potentially harsh impact of the rule, however, the law also developed methods to protect the rights of corporate creditors after dissolution.' " Vernon, 179 Ill. 2d at 345, quoting Tucker, 645 F.2d at 623. There are four exceptions to the general rule of successor corporate nonliability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely the continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. Vernon, 179 Ill. 2d at 345.

The trial court found successor liability on two separate grounds. First, the court found that the Assumption Agreement was an express assumption of liability under the Consulting Agreement. Second, the court determined that National Material was the "mere continuation" of PBS One. Above, in discussing count IX, we held that the Assumption Agreement does indeed constitute an express assumption by National Material of PBS One's liability under the Consulting Agreement. To facilitate proceedings on remand, we reach the alternative ground offered by the trial court and hold as a matter of law that National Material is the mere continuation of PBS One.

The mere-continuation exception applies "when the purchasing corporation is merely a continuation or reincarnation of the selling corporation." Vernon, 179 Ill. 2d at 346. "In other words, the purchasing corporation maintains the same or similar management and ownership but

merely 'wears different clothes.' " Vernon, 179 Ill. 2d at 346, quoting Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458 (11th Cir. 1985). The continuation exception

" 'is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of the reach of the predecessor's creditors. *** To allow the predecessor to escape liability by merely changing hats would amount to fraud. Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.' " Vernon, 179 Ill. 2d at 346, quoting Baltimore Luggage Co. v. Holtzman, 80 Md. App. 282, 297, 562 A.2d 1286, 1293 (1989).

Although the aim of the mere-continuation exception is to prevent fraud, the exception does not require specific proof of an intent to defraud creditors. Amjad Munim, M.D., P.A. v. Azar, 648 So. 2d 145, 153 (Fla. App. 1994) ("Proof of fraudulent intent is not an integral element" of the mere-continuation exception). The mere-continuation exception is a prophylactic measure that is independent of the fraud exception (exception (4)). The latter requires specific proof of intent to defraud and applies regardless of the ownership or control of the new entity. Therefore, for purposes of the mere-continuation exception, it is immaterial whether, as National Material and NM Holding claim, "nothing of record *** demonstrates that it was the 'specific purpose' of PBS One and National Material at the time of the asset sale in 1991 to place assets out of the reach of PBS One's creditors [citation]."

Illinois courts require " 'identity of ownership' " for the mere-continuation exception. Vernon, 179 Ill. 2d at 347, quoting Nilsson v. Continental Machine Manufacturing Co., 251 Ill. App. 3d 415, 418 (1993). Special emphasis is placed on the " 'common identity of officers, directors, and

stock between the selling and purchasing corporation.' " <u>Vernon</u>, 179 Ill. 2d at 346-47, quoting <u>Tucker</u>, 645 F.2d at 625-26; see <u>Hoppa v. Schermerhorn & Co.</u>, 259 Ill. App. 3d 61, 66 (1994) ("Continuity of shareholders is a key factor in the determination of successor corporate liability. Absent continuity of stock ownership, a court cannot find that a transferee corporation is merely a continuation of the transferor").

Tang, the trial court found, was the common denominator, as he "owned and/or controlled all of the entities through which the various transfers occurred." The court's chart, reproduced above, has Tang as (1) "sole shareholder and director" of PBS One; (2) "[s]ole shareholder" of NM Holding; and (3) "[c]ontrolling shareholder" of National Material. The court deduced (3) from the following: (a) Tang's control of NM Holding, which is National Material's general partner, possessing a 1% interest; and (b) Tang's status as "Chairman and President of Tang Industries, which possesses the remaining 99% limited partnership interest in National Material."

National Material and NM Holding do not specifically dispute any of these assertions. They admit that Tang "owned PBS One" but assert that Tang "did not own National Material." The only record citation they provide for the latter contention is to a page containing a copy of the Assumption Agreement. The Assumption Agreement bears what appears to be the signature of Tang as "President" of CT One (later NM Holding), general partner of National Material. The document suggests that National Material is a partnership but does not indicate ownership or control of National Material.

We add that National Material and NM Holding do not make any assertion to us about the ownership of Tang Industries, the limited partner of National Material. It appears as if Tang himself might not have been the majority owner of Tang Industries. Tang testified in his deposition that he

himself did not own "that much" stock in Tang Industries and that the rest was owned by his family trust. (On the other hand, in their response below to plaintiff's statement of undisputed facts in support of summary judgment, National Material and NM Holding denied plaintiff's assertion that "Cyrus Tang and his family trust own all of the stock in Tang Industries.") Though, again, National Material and NM Holding make no issue of the ownership of Tang Industries, the fact that National Material was owned (to some unknown extent) by someone other than Tang would not of itself defeat a finding of mere continuation. "[T]he continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporations." Park v. Townson & Alexander, Inc., 287 Ill. App. 3d 772, 775 (1997). A change of shareholders is consistent with mere continuation as long as the former owners retain a controlling interest in the successor entity. See Hoppa, 259 Ill. App. 3d at 66 (facts that former joint shareholder's interest was reduced to 2% and that additional family member was shareholder of successor corporation did not prevent finding of continuity since former shareholders together had controlling interest in successor). Notably, also in response below to plaintiff's statement of undisputed facts in support of summary judgment, National Material and NM Holding affirmed that National Material was not controlled by Tang Industries but was "controlled solely" by NM Holding. Given that Tang undisputedly is the sole owner of PBS One and undisputedly controls National Material as the sole shareholder of NM Holding, National Material's general partner, and that National Material and NM Holding do not make an issue of the ownership of Tang Industries, the limited partner of National Material, we conclude that the uncontested facts show continuity of ownership from PBS One to National Material.

In so holding, we note Tang's own view of the transfer from PBS One to National Material. In his deposition, Tang stated that PBS One sold "everything" to National Material. When asked why he subsequently decided to have PBS One dissolved, Tang answered: "At that time we have no purpose for us to have P.B.S. One. *** We just have another company." (Emphasis added.) It seems Tang himself regarded the shift as more of form than substance.

National Material and NM Holding claim it is significant that National Material gave valuable consideration, namely $5 million, for the partnership interest. They do not, however, cite any authority for the relevance of this fact. We will not search through Illinois law ourselves to test National Material and NM Holding's assertion, but are content simply to note that, in setting forth the general principles of successor liability, the supreme court in the seminal Vernon case repeatedly refers to a hypothetical "seller" and "purchaser," not just a "transferor" and "transferee," as if the giving of consideration is presumed and of itself no bar to successor liability.

NM Holding argues that judgment may not be entered against it even if National Material is found liable, because plaintiff did not allege in her complaint that "NM Holding either acted or failed to act, or that it directly or indirectly injured her," and "[t]here is no legal basis for holding a general partner liable for its limited partner's obligations to third parties." NM Holding cites no legal authority for the latter remark, which in any event is based on a false factual premise. National Material does not stand as a limited partner of NM Holding. Rather, National Material is itself a partnership of which NM Holding is general partner. As such, NM Holding is liable for the debts and obligations of National Material. See Amber Manor Apartments, 95 Ill. App. 3d at 547 ("The fundamental difference between the liability of general partners and limited partners *** is that the former are responsible in solido for the debts and obligations of the firm, without regard to the

amounts contributed by them to the capital, while the latter is not personally liable *** because his cash contribution is substituted for personal liability").

We emphasize that our holding that National Material is the successor of PBS One--a holding preliminary to whether PBS One is liable as a successor under one of the exceptions to successor nonliability--is not dependent on the Assumption Agreement, for it is undisputed that, as Tang acknowledged in his deposition, PBS One transferred all of its assets to National Material and, accordingly, as the December 1, 1993, amendment to the Partnership Agreement recognized, National Material was the "successor" of PBS One. On the further question of whether National Material is liable as successor for the obligations of PBS One, the Assumption Agreement is indeed material (as we found in discussing count IX), but an entirely independent basis for liability is the undisputed fact of continuity of ownership between PBS One and National Material.

We note that plaintiff argues two additional grounds for successor liability: that the transfer from PBS One to National Material was fraudulent and that PBS One and National Material were merged or consolidated. On the fraud allegation, the trial court found genuine issues of material fact precluding summary judgment. The trial court did not address the merger allegation. Because we have already determined that plaintiff will prevail on two grounds of successor liability (express assumption and mere continuation), subject to the novation defense, we decline to address plaintiff's remaining proposed grounds for successor liability.

In conclusion, we hold that there is no genuine issue of material fact that National Material is the successor of PBS One. Triable fact questions remain, however, on whether there was a novation in favor of National Material and NM Holding. Consequently, we reverse the grant of summary judgment for plaintiff on counts IX and X.

To summarize, we reverse the grant of summary judgment for plaintiff on counts XI (breach of contract--PBS One), IX (breach of contract--National Material and NM Holding), and X (successor liability--National Material and NM Holding). We affirm the denial of summary judgment on those counts for PBS One and Tang, National Material, and NM Holding. Since we are reversing the underlying judgments for plaintiff, we vacate the award of attorney fees to her. Consequently, we do not reach defendants' argument that the shifting of plaintiff's attorney fees to them was improper because the underlying fee agreement between plaintiff and her counsel was invalid.

## V. Conclusion

For the foregoing reasons, we reverse the grant of summary judgment for plaintiff on counts XI (breach of contract--PBS One), IX (breach of contract--National Material and NM Holding), and X (successor liability--National Material and NM Holding). We affirm the denial of summary judgment on those counts for PBS One and Tang, National Material, and NM Holding. We remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

SCHOSTOK and HUDSON, JJ., concur.