(No. 57489.—

JAMES G. YORK *et al.*, Appellants, v. JOHN C. STIEFEL, Appellee.

*Opinion filed December 16, 1983.—Rehearing denied January 27, 1984.*

SIMON, J., concurring in part and dissenting in part.

Richard D. Price, Jr. & Associates, Ltd., of Peoria (Richard D. Price, Jr., of counsel), for appellants.

Heyl, Royster, Voelker & Allen, of Peoria (Lyle W. Allen and Gary D. Nelson, of counsel), for appellee.

JUSTICE WARD delivered the opinion of the court:

This appeal is from a judgment of the appellate court that reversed judgments of the circuit court of Peoria County in favor of the plaintiffs, James York, Janis M. York and Donna J. LaCroix, in a legal malpractice action they had brought against John C. Stiefel, an attorney. (109 Ill. App. 3d 342.) Donna LaCroix' husband, Lawrence LaCroix, was also a plaintiff, but because the jury did not reach a verdict on his claim, the court declared a mistrial as to his action. The court later allowed his motion for a voluntary dismissal of his claim. We granted the plaintiffs' petition for leave to appeal under Rule 315 (87 Ill. 2d R. 315).

The claim of legal malpractice was based upon advice the defendant gave to James York and Lawrence LaCroix on February 6, 1976. James York and Lawrence LaCroix were officers in a corporation operating an auto dealership in Peoria, which the defendant had formed for them. The advice complained of was that they personally guarantee, by executing second mortgages on their homes, a debt the corporation owed to a Peoria bank.

York and LaCroix first consulted the defendant relative to purchasing the dealership, which was for Porsche and Audi automobiles, in 1974. York had met the defendant two years earlier, when York was a salesman at a Porsche-Audi dealership in Winnetka. York suggested to LaCroix that the defendant serve as the attorney to or-

ganize their new business. Only York and LaCroix consulted the defendant in regard to the business. Janis York and Donna LaCroix, their wives, did not at any time confer professionally with the defendant.

The defendant suggested a subchapter S corporate arrangement and incorporated Countryside Porsche-Audi, Inc. (Countryside), with LaCroix as president, York as vice-president, and the defendant as assistant secretary and registered agent. Janis York and Donna LaCroix were not officers or employees of the corporation. To provide capital for the corporation, LaCroix and York each purchased 500 shares of Countryside's stock at a dollar a share, and York's father made a capital loan to the corporation of $50,000.

The Jefferson Bank in Peoria also made a capital loan of $75,000 to Countryside, which was guaranteed by the Small Business Administration. The SBA obtained the personal guarantees of all of the plaintiffs to reimburse the SBA for any payment the SBA might be required to make in the event Countryside defaulted on the loan.

The defendant did not participate in the negotiating of these loans, but he did participate in negotiating a "floor plan" agreement with the Jefferson Bank to provide inventory for Countryside. Under this agreement, entered into in 1974, Countryside would order automobiles and the bank would pay the manufacturer or distributor for the cars. The bank, in turn, took a security interest in each of the cars, and Countryside, for each car it sold, was obligated to remit to the bank the amount of the bank's secured interest. The limit to which the bank would provide this financing was set at $275,000.

The defendant, though he assisted in the negotiations as to this loan, was not present when the final form of the agreement was signed, although there was testimony by LaCroix that he had read the final documents to the

defendant on the telephone and obtained his approval before he and York signed them. LaCroix testified that he believed that he had also sent the defendant a copy of the documents. Unlike the case of the bank loan guaranteed by the SBA, the floor-plan loan was not personally guaranteed by the plaintiffs. The legal advice to personally assume this obligation formed the ground for the malpractice action.

In January 1976 the bank learned that Countryside was violating the floor-plan agreement by selling automobiles secured under the agreement and failing to remit to the bank the amount of its secured interest. There was testimony that this is commonly referred to as selling cars "out of trust." (LaCroix and York did not deny that they were doing this, and said that the funds obtained from the sales were used to meet operating expenses of the business.) The bank froze the personal savings accounts of the plaintiffs, and a representative of the bank appeared at the dealership on Monday, February 6, 1976, and gave an ultimatum. The representative said that the bank intended to close the dealership at the end of the day unless it received personal assurances to secure the floor-plan loan and a debt created when the bank had allowed Countryside to overdraw on its corporate bank account. The personal assurances as security were second mortgages on the houses of the LaCroixs and the Yorks.

LaCroix phoned the defendant for advice, and that day drove to Chicago and conferred with him for about eight hours. The defendant conducted various telephone conferences with a bank officer and the bank attorney. He advised LaCroix in person, and York by telephone, to execute second mortgages and to release their personal savings accounts to the bank. He told LaCroix that a corporate bankruptcy would be useless. Following this advice, the Yorks and LaCroixs executed the second

mortgages a few days later for a total of $54,500, which represented the amount that Countryside was "out of trust" and the amount the bank had allowed Countryside to overdraw on its corporate bank account.

York and LaCroix testified that in advising them to execute the second mortgages, the defendant told them that they had already personally guaranteed the floor-plan loan and, therefore, had nothing to lose in complying with the bank's demand. When he gave this advice, the defendant did not have the floor-plan agreement before him, but according to LaCroix' testimony, he told LaCroix that he recalled that it contained a personal guarantee. York and LaCroix testified that their decision to execute the second mortgages was based upon the defendant's statement that they were already personally liable on the floor-plan loan. As stated above, the floor-plan agreement did not contain a personal guarantee by York and LaCroix.

The defendant testified that, when LaCroix consulted him on February 6, he searched his file for the floor-plan agreement but did not find it. He stated that the bank officer with whom he spoke (the defendant did not recall the officer's name), told him twice that there was a personal guarantee on the floor-plan indebtedness. The defendant said too that Charles Young, the bank attorney, "corroborated" that there was this personal guarantee. Young also "corroborated," the defendant testified, that the bank wished to have LaCroix and York prosecuted for violating section 9—306.01 of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 9—306.01), which makes it a felony for a debtor, who has a right of sale of collateral under a security agreement requiring him to account to the secured party for the proceeds of a sale, to "willfully and wrongfully" sell the collateral without paying the proceeds to the secured party.

The defendant testified that the bank, in return for

the personal guarantees by York and LaCroix, gave Countryside 30 additional days to operate the business and in that time seek financing elsewhere or sell the assets of the corporation themselves in a nondistress situation. During that 30-day period, however, refinancing was not obtained. At the expiration of the period the bank closed down the business and, it appears, sold the assets.

Young, the bank's attorney, testified that he did not recall telling the defendant that there was a personal guarantee in the floor-plan loan. He said he did not recall hearing any other bank officer stating that to the defendant. Too, he said that while the defendant and he discussed the possible applicability of the criminal statute we have referred to, he did not tell the defendant that the bank was going to ask for prosecution.

Young explained that the second mortgages were executed as security for a note the plaintiffs executed in the amount that Countryside was "out of trust" and overdrawn. In a "paper transfer," the bank loaned the plaintiffs the mortgage money, then transferred it to the corporation, which enabled the corporation to "correct the *** default that existed at that time." The note, executed by the plaintiffs, had not been satisfied in full at the time of trial, and the Yorks had sold their home, applying the proceeds to the debt.

The plaintiffs presented two attorneys as expert witnesses. One testified in response to a hypothetical question that in his opinion it was poor judgment to give legal advice without having consulted the actual documents relating to the personal guarantees. He stated, however, that he considered that a wish of the debtors to liquidate the business was a valid factor in recommending a given course of action.

The other attorney testified that in his opinion the defendant failed to act as a reasonably prudent attorney

would in that he relied upon his memory of the floor-plan agreement or relied upon opposing counsel's representations as to the existence of a personal guarantee in the agreement in giving advice to his clients. A reasonably prudent attorney, he said, even in the emergency circumstances, would have examined relevant documents before giving the advice.

An attorney, testifying for the defendant, disagreed with the other attorneys' opinions. In his opinion the defendant had not acted negligently and, in fact, gave sound advice. It was not bad practice, in his opinion, for a lawyer to give specific advice regarding documents though he had not seen the documents for two years. He considered the attorney had exercised a reasonable degree of care.

As stated, the appellate court reversed the judgments entered on the verdicts for James York, Janis York and Donna LaCroix. The court considered that there was insufficient evidence to support a conclusion that the defendant had an attorney-client relationship with Janis York and Donna LaCroix. It judged, too, that the plaintiffs did not present sufficient evidence that the defendant's conduct had proximately caused the plaintiffs' damages.

The plaintiffs argue that the appellate court erred and also criticize the preparation and form of the appellate court opinion, saying that it borrowed extensively from the defendant's brief.

The function of this court is to review the judgment appealed from and not pass on the form of the opinion involved. (*Gould v. Gould* (1951), 408 Ill. 526, 529; *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 321; *Stanton v. Chicago City Ry. Co.* (1918), 283 Ill. 256, 259.) There is no evidence to support the contention that the appellate court did not consider the plaintiffs' claims of error.

The judgments for Janis York and Donna LaCroix

were properly reversed by the appellate court, but we judge that the court erred in reversing the judgment in favor of James York.

The plaintiffs' action was brought on the ground of negligence, and in such actions it is necessary for the plaintiff to establish the existence of a duty of care on the part of the defendant to the plaintiff. (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 18; *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 374.) In a legal malpractice action, this may be done by showing that the plaintiff was a client of the defendant, or if not the defendant's client, by showing that the primary purpose of the attorney-client relationship between the defendant and another party was to benefit the plaintiff. (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13.) There was no showing here of either of those requirements so far as the plaintiffs Donna LaCroix and Janis York were concerned.

It is clear that Donna LaCroix and Janis York were not clients of the defendant. At no time did they request or receive legal advice from the defendant upon the matters here. There was testimony that the defendant had on an earlier occasion represented the Yorks in the sale of a house and had at another time represented the LaCroixs in the sale of their home. Those matters were not related to the business of Countryside. Nor was the primary purpose of the attorney-client relationship between Lawrence LaCroix and James York and the defendant to benefit the clients' wives.

The plaintiffs do not assert that a duty of care to the wives could have arisen solely because of the marital relationship. They do, however, argue that the defendant was aware that the documents he was advising his clients to sign would be required to be signed by the clients' wives as well. They stress also that the defendant negotiated a homestead exemption in the second mortgage, which exemption would be to the benefit of the

wives as well as the clients. This does not alter our conclusion. The defendant's advice was given only to James York and Lawrence LaCroix. At most, the clients' wives could be considered only incidental beneficiaries, and incidental beneficiaries are not qualified to bring a malpractice action of this character. *Pelham v. Griesheimer* (1982), 92 Ill. 2d 13.

The appellate court erred in reversing the judgment for James York on the ground of insufficient evidence. There was expert testimony for York that it was a violation of the required standard of care for the defendant to give the advice concerned without consulting the floor-plan documents. The advice the defendant gave, and York's decision to follow it, were both based upon the erroneous assumption that under the floor-plan agreement York had already assumed a personal liability. The damage to York that was alleged was this assumption of a corporate debt.

The verdict of the jury in favor of York should stand. Reversal of a jury verdict must be supported by evidence which, when viewed most favorably to the party prevailing in the trial court, nevertheless so overwhelmingly favors the appellant that no contrary verdict could stand. (*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 486.) The evidence here does not satisfy that standard.

For the reasons given, the portion of the judgment of the appellate court reversing the circuit court's judgments for Janis York and Donna LaCroix is affirmed; the portion reversing the circuit court's judgment for James York is reversed and the circuit court judgment for James York is affirmed.

> *Appellate court affirmed in part*
> *and reversed in part; circuit*
> *court affirmed in part and*
> *reversed in part.*

JUSTICE SIMON, concurring in part and dissenting in part:

I agree that the appellate court erred in reversing the judgment in favor of James York. However, I believe that the wives, Janis York and Donna LaCroix, were also Mr. Stiefel's clients. My view is that, when their husbands conferred with him on their own behalf, they were also seeking his advice as agents of their wives, and accordingly there was an attorney-client relationship between Mr. Stiefel and them as well as their husbands. I would therefore reverse the appellate court's decision as to Mrs. LaCroix.

Where a husband and wife both suffer a single financial injury, they should not both recover for it. In the case of Mr. and Mrs. York, although the appellate court decision should be reversed as to her, the reversal should be with the caution that she and Mr. York should not enjoy a double recovery. However, since Mrs. LaCroix' husband has gained no recovery, I see no reason why she should not have her day in court.

Whether this case is characterized in terms of tort or contract, the wives were clients in their own right, not incidental beneficiaries of the attorney-client relationship between Mr. Stiefel and their husbands. When Mr. Stiefel advised the husbands, he was simultaneously providing information to be passed along to the wives.

Any other position would be unrealistic on the facts of this case. Mr. Stiefel was dealing with a two-man enterprise, not with a large corporation in which the officers kept their personal and business affairs separate and retained different attorneys to attend to each. Mr. Stiefel had previously handled both business and personal matters for these families. He was the attorney when these husbands and wives purchased their homes. Since he was familiar with the form of ownership and with the mortgage encumbrances on these properties, it was not necessary for the wives to confer with him per-

sonally in order to explain the nature or extent of their interests. The fact that the wives did not confer with Mr. Stiefel personally is therefore not dispositive. Since no action was taken in Mr. Stiefel's office which required the wives' presence or their signatures at that time, it was reasonable for everyone involved to assume that the wives' attendance was unnecessary. Even if the husbands did not specifically indicate that the wives would also consider Mr. Stiefel's advice and act upon it, a reasonably prudent attorney should have been aware from his knowledge of the joint ownership, his previous dealings with these couples, and the nature of the marital relationship that this would be the case.

The test as to whether an attorney-client relationship is established should in my opinion be an objective one. If the facts reasonably indicate to the attorney that spouses of those who consult him will also receive his advice and rely on it, the presumption is that the spouses should be regarded as clients. It is not necessary for each spouse to come face to face with the attorney to establish the relationship. If the attorney under these circumstances does not wish to assume responsibility for the other spouse's action in reliance on his advice, he must expressly disclaim any obligation to that spouse.

*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, does not apply here. In *Pelham*, we said, "[F]or a *nonclient* to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." (Emphasis added.) (92 Ill. 2d 13, 21.) Since these wives were clients, they should be able to maintain a malpractice action against their allegedly negligent attorney. The situation would be controlled by *Pelham* if, for example, Mr. Stiefel had advised the husbands to offer as security an insurance policy on which the wives were named as beneficiaries. That is not this

case. These wives are not third parties to transactions involving their homes.