# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Reddick v. Suits*, 2011 IL App (2d) 100480

---

| | |
|---|---|
| Appellate Court Caption | HAUL REDDICK, Individually and as Executor of the Estate of Mark Reddick, Deceased, and DEBRA REDDICK, Plaintiffs-Appellants, v. M. THOMAS SUITS and LAW OFFICE OF M. THOMAS SUITS, P.C., Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-10-0480 |
| Rule 23 Order filed | June 16, 2011 |
| Rule 23 Order withdrawn | November 8, 2011 |
| Opinion filed | November 8, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly entered summary judgment for defendants in a legal malpractice action alleging that defendants made errors in attempting to reinstate an administratively dissolved corporation in which plaintiffs were officers or directors, since defendants' only duty was to the corporation and they had no duty to plaintiffs, regardless of plaintiffs' arguments that the requirement that plaintiffs be in privity with the attorney in a legal malpractice action had been abolished in Illinois, that plaintiffs were intended third-party beneficiaries of defendants' representation, and that a genuine issue of material fact existed as to the parties' intent. |
| Decision Under Review | Appeal from the Circuit Court of Ogle County, No. 09-L-10; the Hon. Michael T. Mallon, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Alan H. Cooper, of Rochelle, for appellants. |
| | James J. Sipchen and Matthew F. Tibble, both of Pretzel & Stouffer, Chtrd., of Chicago, for appellees. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion. Justices Zenoff and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs, Haul Reddick, both individually and in his capacity as executor of the estate of his deceased brother, Mark Reddick, and Debra Reddick, appeal the judgment of the circuit court of Ogle County granting the motion for summary judgment of defendants, M. Thomas Suits and the Law Office of M. Thomas Suits, P.C. Below, plaintiffs contended that they incurred damages resulting from defendants' errors in reinstating an administratively dissolved Illinois corporation. The trial court granted defendants' motion for summary judgment on the ground that defendants owed no duty to plaintiffs, but only to Mark's corporation. (The trial court expressly did not rule on other aspects of their motion or on plaintiffs' cross-motion for summary determination of major issues.) On appeal, plaintiffs contend that defendants owed a duty to them, that the remaining grounds asserted in defendants' motion for summary judgment were insufficient, and that the trial court erred in failing to grant plaintiffs' cross-motion for summary determination of major issues. We affirm.

¶ 2    We first summarize the facts appearing of record. On July 8, 2005, RPF Holdings, Inc. (RPF), was incorporated. Suits was the attorney who performed the incorporation. Mark Reddick, Neil Scott, and John Vukadinovich were the original shareholders of RPF, each with an approximately one-third share of the business.

¶ 3    RPF produced plastic film from resin. It had acquired the assets of an earlier corporation, Rochelle Plastic Film, Inc., which was in the same business. Suits had represented Rochelle previously. In 2005, Suits was approached by Mark Reddick and John Buckner to effect the transfer of assets from Rochelle to RPF. Rochelle was at that time in default with respect to a secured creditor and could no longer pay its debts. Suits provided legal services to both Rochelle and RPF. Rochelle's assets were transferred to the secured creditor and then purchased by RPF from the creditor in exchange for RPF assuming Rochelle's secured debt. RPF continued to do business with some of Rochelle's trade creditors, but sent letters to others indicating that Rochelle was unable to pay its debts to them.

¶ 4    Mark Reddick, who died on March 3, 2007, was the president of RPF until his death. When he died, his brother, Haul Reddick, became the executor of Mark's estate (Estate).

¶ 5    Early in 2007, as a result of Mark's illness, Haul first became involved with RPF's business. Haul testified in his deposition that he had grown up in North Carolina (where Mark lived) but had moved to Arizona in 1973. Haul had a doctorate in educational administration from Northern Arizona University and had taken two undergraduate courses in accounting. Haul had served as an officer of Reddick Education Services, an Arizona corporation; Reddick Realty, an Arizona real estate holding company; and Reddick Fumigants, a North Carolina corporation of which Mark had been president until his death. Haul's responsibilities with Reddick Education included making sure that the corporation remained in good standing. Haul testified that it was his understanding that, if a corporation did not remain in good standing, then the shareholders could be liable for the debts incurred by the corporation.

¶ 6    From January 2007 until Mark's death in March 2007, Haul reviewed the files relating to RPF and talked to Mark about the business. Haul reviewed, among other things, RPF's financial statements. Haul testified that the quality of all of the financial statements he reviewed was suspect, and he never received any financial statement that he would have been willing to say was correct. As a result of his review, Haul concluded that RPF should be sold or liquidated as quickly as possible, and no more money should be invested in the company. Haul advised Neil Scott of his conclusion in a written memo. Haul also advised Scott that he had reviewed a letter of intent from John Buckner, the general manager of RPF responsible for its day-to-day operations, on behalf of RPF Acquisitions, offering to purchase all of RPF's assets. He further noted that he had discussed with Buckner problems relating to Vukadinovich, who, in October 2006, had been removed from his director's position.

¶ 7    Shortly after Mark's death, Haul was elected president and director of RPF. Haul had not previously been an officer or a director of RPF, and he was never a shareholder. At the time of his elections, the shareholders of RPF were the Estate, Scott, and Vukadinovich. The directors of RPF were Debra Reddick (Mark's widow), Haul, and Scott. The officers of RPF were Haul (president), Scott (vice president), and Debra (secretary). Vukadinovich was RPF's registered agent, and its day-to-day operations were still under Buckner's direction.

¶ 8    On March 7 or 8, 2007, Haul learned that, as of December 1, 2006, RPF had been administratively dissolved. On Friday, March 9, 2007, Haul sent an e-mail to Buckner about the dissolution, directing that the corporation be reinstated and the registered agent be changed from Vukadinovich to Tom Winebaugh. Haul testified that he wanted RPF to be reinstated because RPF Acquisition's letter of intent required the company to be in good standing, as well as to ensure that Mark or the Estate would not be personally liable (Haul believed at that time that a corporation's shareholders could be personally liable if the corporation were dissolved). Haul did not understand that it was not the shareholders who faced personal liability, but the directors and officers of the corporation who could be liable for the corporation's dealings while it was dissolved. Haul testified that, had he known, he would likely have consulted with an attorney and removed himself as an officer and director of RPF.

¶ 9        On the same day, Buckner forwarded Haul's e-mail to Suits, informing him that "we need to take care of this pronto." Later on the same day, Suits sent an e-mail to Haul stating that he had completed the documents needed for reinstatement and would send them to the Illinois Secretary of State on Monday, March 12.

¶ 10       Beginning March 12, 2007, a parade of missteps and errors ensued as Suits unsuccessfully attempted to have RPF reinstated. On that day, he submitted a package containing a completed 2006 annual report form, a check, and a form to change the registered agent. The package did not contain an application for reinstatement or a check for the reinstatement fee. On March 30, 2007, the Secretary of State rejected Suits' first submission because no application for reinstatement had been included. The Secretary of State sent a letter with this information to Vukadinovich stating why RPF remained dissolved and enclosing a reinstatement form as well as an estimate of the fees and penalties necessary to accomplish both the reinstatement and the change of the registered agent.

¶ 11       On April 17, Suits sent Haul a letter including two originals of the application for RPF's reinstatement and requesting that Haul sign them and return them. On April 20, Haul signed the reinstatement forms and returned them to Suits.

¶ 12       Suits did not submit the applications received from Haul, because, in the meantime, Tom Winebaugh told Suits that he had submitted the forms to reinstate RPF. Suits knew that Winebaugh was a certified public accountant. At this point, Haul had not told Suits that he was no longer to be involved in the effort to reinstate RPF. On April 27, Haul e-mailed Suits asking when RPF would be reinstated and asking Suits to identify the forms that Winebaugh had submitted. On May 2, Suits e-mailed his reply, averring that "[a]ll of the necessary forms and funds" were sent to the Secretary of State. Suits testified in his deposition that he believed he had asked Winebaugh what documents he had submitted and was satisfied with Winebaugh's response.

¶ 13       On May 3, the Secretary of State rejected Winebaugh's submission because Winebaugh did not include an application for reinstatement. On May 8, Winebaugh sent a letter to Suits noting that the application for reinstatement needed to be included. Winebaugh sent Suits all of the materials he had so Suits could forward them to Haul for signature. When Suits received Winebaugh's information, he mailed a second submission to the Secretary of State. In this submission, Suits included the signed application for reinstatement, the 2006 annual report, and a check sufficient to cover the fees and penalties.

¶ 14       On May 18, the Secretary of State rejected Suits' second submission because the registered agent on the annual report was not the same as the one on the application for reinstatement. On May 31, Suits made a third submission to the Secretary of State. However, on June 19, the Secretary of State returned the third submission to Suits because, on May 25, RPF had been reinstated. As it turned out, on May 24, Haul had retained a law firm in Springfield to accomplish the RPF reinstatement. On May 25, the Springfield law firm submitted the necessary paperwork and fees and penalties, and on the same day, RPF was reinstated.

¶ 15       In his deposition, Suits testified that, as of March 9, 2007, at the beginning of the reinstatement efforts, he understood that, if a corporation were dissolved but continued to

carry on its regular business and to enter into contracts, then the officers and directors faced potential personal liability for any obligations the corporation incurred during the period it was dissolved. Further, their liability would not be extinguished retroactively by reinstatement of the corporation. Suits did not discuss these risks with Haul.

¶ 16    Suits further testified that he had experience in reinstating a dissolved corporation and was aware of the requirements for reinstatement, including the submission of all completed annual report forms that had not been previously submitted, a completed application for reinstatement, and all required fees and penalties. Suits was also aware that a reinstatement could be expedited with the payment of an additional fee.

¶ 17    Suits acknowledged that, as legal tasks go, reinstating a dissolved corporation is a relatively simple task. However, if the task were not completed correctly or promptly, it could create significant risks of personal liability for the officers and directors of the corporation. Suits acknowledged that he had not accomplished the reinstatement correctly as he forgot or neglected to include the application for reinstatement along with the other materials submitted.

¶ 18    Suits testified that, in undertaking to reinstate RPF, his client was the corporation and only the corporation. He was not hired to represent Haul, Debra, or the Estate. Likewise, Haul testified that he did not hire Suits to represent him or Debra, personally. Haul further testified that, to the best of his knowledge, Suits had not performed any legal services for him personally or individually, or for Debra personally or individually.

¶ 19    Suits testified that, as of March 9, he was retained to reinstate RPF, but he had no knowledge about RPF's condition, its status, its finances, or who were the officers and directors and whether there had been any change to the officers and directors since RPF's incorporation. Suits did not ask and was not informed whether RPF was continuing to do business following its December 2006 dissolution. Suits was also unaware of any measures, aside from hiring Buckner as a consultant, to solve the issues that caused Rochelle to fail. Suits acknowledged that, from the time he was retained until the end of May, he never discussed with Haul any of the risks to him or the other officers and directors if RPF continued to conduct business following its dissolution.

¶ 20    While RPF was dissolved, it continued in business under Buckner's daily direction. RPF's operations included purchasing materials from vendors and paying its bills. Debra was not involved in RPF's business and, according to Haul, was a director in name only. Haul was not consulted about ordering resin and did not know when resin would be ordered or even if the invoices for the resin were being paid. In April 2007, Haul was contacted by Shannon Industrial, one of RPF's resin suppliers, about payments that it had not received and a problem with the banking arrangements. Haul referred the problem to Buckner, who reported back to Haul that there had been delays in paying Shannon, but everything had been taken care of.

¶ 21    On June 4, 2007, Shannon filed a suit against RPF, Vukadinovich, Buckner, Haul, and Debra. Later, Buckner was dismissed from the suit, and Scott and the Estate were added as parties defendant. It was only after the Shannon suit had been filed that Haul consulted with the Estate's attorney and learned that under Illinois law he and Debra, as directors, were

exposed to personal liability for the debts of RPF.

¶ 22 Shannon sought to recover $400,000 for unpaid invoices incurred during the period of RPF's dissolution, as well as for the balance owed on a predissolution promissory note from RPF to Shannon. Shannon alleged that the individual defendants were personally liable due to their positions as officers and directors carrying on RPF's business after it had been dissolved.

¶ 23 Shannon sought to recover from RPF, Haul, Debra, Scott, and the Estate for the unpaid invoices for goods sold and delivered during the RPF dissolution, in the amount of about $255,000. Of this amount, about $71,000 was for invoices dated after the dissolution but before Suits was retained to reinstate RPF, and about $184,000 was for invoices incurred between the date Suits was retained and the date RPF was reinstated (March 9 to May 25). Shannon also sought to recover from RPF for the balance on the promissory note totaling about $135,000. Plaintiffs retained Much Shelist Denenberg Ament & Rubinstein, a Chicago law firm, to defend them against Shannon; Scott retained separate counsel.

¶ 24 Eventually, the parties reached a settlement in the Shannon lawsuit. For their part, plaintiffs paid $135,000 to Shannon. Scott made a separate payment. Plaintiffs also incurred and paid attorney fees in the amount of about $80,000.

¶ 25 The settlement agreement between the parties did not provide an allocation of the total settlement amount among the different claims. In his supplemental affidavit, however, Haul stated that, during the negotiations and at the time of the settlement, RPF was insolvent and had again been dissolved, and it could pay nothing toward either the settlement or the attorney fees. Haul further averred that RPF did not make any payments. In addition, Haul averred that it was due only to the individual plaintiffs' potential personal liability that the settlement amount was offered and paid, and no portion of the settlement was attributable to the release of RPF. RPF was included in the settlement only because of plaintiffs' concern that, if RPF were not released, there might be some way that a future judgment against RPF could result in additional personal liability against the individual plaintiffs.

¶ 26 The Estate made all payments for the settlement and attorney fees on plaintiffs' behalf. In turn, plaintiffs agreed that any net recovery from a legal malpractice action against Suits would be paid to the Estate.

¶ 27 On June 8, 2009, Rochelle Industrial Properties, Ltd. (landlord), RPF's landlord, filed an action against Haul, Debra, and Scott for unpaid rent totaling nearly $39,000, which was due during the period of RPF's dissolution. The landlord alleged that Haul and Debra were personally liable for the unpaid rent because of their positions as RPF's officers and directors. When Haul executed his supplemental affidavit, the landlord's lawsuit over the unpaid rent was still pending, Haul and Debra had incurred attorney fees to defend against it, and the Estate had advanced the necessary funds.

¶ 28 After the Shannon suit had settled, plaintiffs filed this action against Suits alleging that he was negligent in failing to take the necessary steps to have RPF reinstated in a timely fashion, along with failing to advise them about the potential personal liability they faced if RPF continued to conduct business while it was dissolved. Plaintiffs further alleged that Suits' negligence was the proximate cause of their damages, which they alleged to be the

amount of the Shannon settlement and the attorney fees they incurred defending against Shannon's action and the landlord's action. Suits denied liability and raised a number of affirmative defenses.

¶ 29 The parties filed cross-motions for summary judgment. The trial court entered judgment in favor of defendants and against plaintiffs, holding that defendants owed no duty to plaintiffs and declining to address any of the other issues raised in the cross-motions. Plaintiffs timely appeal.

¶ 30 On appeal, plaintiffs argue that the trial court erred in granting defendants' motion for summary judgment and denying plaintiffs' cross-motion for summary determination of major issues. Summary judgment may be granted where the pleadings, depositions, admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008); *Pielet v. Pielet*, 407 Ill. App. 3d 474, 490 (2010). When considering a motion for summary judgment, the court views the record in the light most favorable to the nonmoving party and will grant the motion only where the moving party's right to judgment is clear and free from doubt. *Pielet*, 407 Ill. App. 3d at 490. The motion for summary judgment does not ask the court to decide a question of fact, but asks the court to determine if a question of fact exists that would preclude the entry of summary judgment as a matter of law. *Pielet*, 407 Ill. App. 3d at 491. We review *de novo* the trial court's decision whether to grant or deny summary judgment. *Pielet*, 407 Ill. App. 3d at 491.

¶ 31 Plaintiffs argue that defendants committed legal malpractice when Suits botched his attempts to reinstate RPF from its administrative dissolution. To succeed on a claim of legal malpractice, a plaintiff must prove that the attorney owed the plaintiff a duty of due care, the attorney breached the duty, the plaintiff was injured as a proximate result of the breach, and damages. *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 748 (2008). If the plaintiff fails to prove the existence of any one of the elements of legal malpractice, the plaintiff cannot prevail on its legal malpractice claim. *Nettleton*, 387 Ill. App. 3d at 748.

¶ 32 In this case, the trial court held that plaintiffs could not succeed in proving the element of duty. Generally, an attorney owes a duty only to his client, and not to third persons. *Pelham v. Griesheimer*, 92 Ill. 2d 13, 19 (1982). However, in *Pelham*, the court noted that the trend in tort law was toward abolishing the privity-of-contract requirement in determining duty. *Pelham*, 92 Ill. 2d at 20. In order to avoid making the attorney's duty unlimited, the court held that, for an attorney to have a duty toward a nonclient third-party plaintiff, that plaintiff must plead and prove facts showing that the plaintiff is an intended third-party beneficiary of the relationship between the attorney and the client. *Pelham*, 92 Ill. 2d at 20. In other words, to establish a duty between an attorney and a nonclient third-party plaintiff, the plaintiff must prove that the "primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." *Pelham*, 92 Ill. 2d at 21. In so holding, the court acknowledged the California balancing approach, which considers the following factors:

"the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of

-7-

the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct[,] and the policy of preventing future harm." *Pelham*, 92 Ill. 2d at 22.

The court did not adopt this balancing test, however, observing that the test usually reduced to considering whether the services were intended to benefit the plaintiff. *Pelham*, 92 Ill. 2d at 22. The court further differentiated, somewhat, between representation in cases of an adversarial nature and nonadversarial nature, stating that, in the adversarial setting, "in order to create a duty on the part of the attorney to one other than a client, there must be a clear indication that the representation by the attorney is intended to directly confer a benefit upon the third party." *Pelham*, 92 Ill. 2d at 23. The court also noted that the courts employing the California balancing test were more willing to extend the attorney's duty to third parties in cases in which the attorney's representation was nonadversarial. *Pelham*, 92 Ill. 2d at 22. With this background in mind, we turn to plaintiffs' contentions.

¶ 33    Plaintiffs challenge the trial court's judgment that Suits owed them no duty. Plaintiffs argue that the trial court's judgment was erroneous for three reasons: (1) in legal malpractice cases, Illinois has abolished the requirement that the plaintiff be in privity with the defendant-attorney; (2) plaintiffs were the intended third-party beneficiaries of Suits' representation of RPF for purposes of reinstating it; and (3) a genuine issue of material fact regarding the parties' intent precludes the entry of summary judgment. We consider each argument in turn.

¶ 34    Plaintiffs first contend that the requirement of privity in legal malpractice cases has been relaxed or abolished to allow third parties to bring a malpractice claim against an attorney. This argument is somewhat a straw man. While defendants argued below (and here) that plaintiffs were not represented by Suits, this was not defendants' only argument. Rather, this argument was intended only to foreclose a general, run-of-the-mill legal malpractice claim, not to foreclose a third-party beneficiary legal malpractice claim. Indeed, defendants acknowledged that the privity requirement had been abolished by *Pelham*, 92 Ill. 2d at 21. Thus, neither party disagrees that a third party, under the proper circumstances, can maintain a legal malpractice action against an attorney. The parties disagree, however, on whether the circumstances of this case are appropriate to support a legal malpractice action. Accordingly, while we agree with plaintiffs that third parties to the attorney-client relationship may maintain legal malpractice actions, our inquiry must continue.

¶ 35    Plaintiffs next contend that they were the intended third-party beneficiaries of Suits' representation of RPF. As noted in *Pelham*, an attorney will owe a duty to a third party only where the attorney was hired by the client specifically for the purpose of benefitting that third party. *Pelham*, 92 Ill. 2d at 21. The "key consideration" for determining if the attorney owed a duty to the third party is whether the attorney was "acting at the direction of or on behalf of the client to benefit or influence [the] third party." *Pelham*, 92 Ill. 2d at 21. Utilizing that key consideration, we hold that Suits owed no duty to plaintiffs. While Haul in fact retained Suits, he, in his capacity as an agent of RPF, retained Suits to represent RPF with regard to reinstating it from an administrative dissolution. The corporate entity, RPF, was Suits' client, and the purpose of Suits' engagement was to restore RPF's good standing. This would have two direct benefits to RPF: it would enable RPF to conduct business, and it would facilitate

-8-

the sale of RPF's assets. The restoration of RPF's good standing would have an incidental benefit to the directors and officers in that they would no longer be personally liable for any contracts entered into or business conducted by RPF. We cannot say, however, that Suits was acting at RPF's direction to benefit or influence the directors or officers of RPF. Consequently, Suits owed no duty to plaintiffs, and the trial court's judgment was correct.

¶ 36    *Schechter v. Blank*, 254 Ill. App. 3d 560 (1993), reinforces our conclusion. In *Schechter*, the defendant lawyer was retained by two corporate entities to institute chapter 11 bankruptcy reorganizations. The defendant allegedly negligently handled the chapter 11 bankruptcies by failing to take the steps needed to secure each entity's most valuable asset, and, by failing to preserve these assets, the entities were forced to convert the chapter 11 bankruptcies into chapter 7 liquidations in bankruptcy, which also forced the individual plaintiff-owners to file for individual bankruptcy. *Schechter*, 254 Ill. App. 3d at 561. The plaintiffs contended that it was " 'axiomatic' " that a chapter 11 bankruptcy was filed for the benefit of the corporate creditors, and this conferred standing upon the plaintiffs to raise legal malpractice claims against the lawyer. *Schechter*, 254 Ill. App. 3d at 562-63. The court determined that the "primary and direct reason" that the plaintiffs hired the lawyer to handle the chapter 11 reorganizations was to keep their businesses afloat; thus, while the owners and creditors would benefit more from a chapter 11 reorganization than a chapter 7 liquidation, the primary purpose and intent of the lawyer's representation was not the payment of the creditors, but to reorganize and preserve the businesses so that the owners could continue to have creditors and run their businesses. *Schechter*, 254 Ill. App. 3d at 565. Additionally, the court cautioned:

> "The fact that a third party may benefit from an attorney's representation of his client does not mean that the attorney thereby owes a duty to the third party. [Citation.] As stated above, the law only imposes a duty upon an attorney for the benefit of a third party when the 'primary purpose and intent' of the attorney-client relationship is to benefit the third party. It would strain the meaning of the 'primary purpose and intent' language in *Pelham* for a third party to come within that category simply because he may benefit from the attorney's representation of his client." *Schechter*, 254 Ill. App. 3d at 566-67.

¶ 37    *Schechter* is directly on point. Here, the primary purpose and intent of Suits' representation of RPF was to reinstate it from administrative dissolution. That RPF's directors and officers would benefit by being freed of the possibility of personal liability for business conducted by RPF is incidental to the primary purpose and intent of restoring RPF to good standing. That incidental benefit does not transform the primary purpose and intent of Suits' representation into protecting RPF's directors and officers. *Schechter*, 254 Ill. App. 3d at 567. Accordingly, we conclude that *Schechter* provides strong support for our conclusion that Suits owed plaintiffs no duty.

¶ 38    Plaintiffs argue that the trial court erred in its assessment of Suits' duty. Initially, plaintiffs focus on *Pelham*'s discussion of duty to third parties in adversarial and nonadversarial situations. Plaintiffs begin with the court's statement regarding a nonadversarial representation: "It would appear that courts are more willing to apply the balancing test to extend an attorney's duty to nonclients in cases in which the attorney's representation of his client has essentially been of a nonadversarial nature." *Pelham*, 92 Ill.

-9-

2d at 22. Next, plaintiffs note that, in adversarial representations, "in order to create a duty on the part of the attorney to one other than a client, there must be a clear indication that the representation by the attorney is intended to directly confer a benefit upon the third party." *Pelham*, 92 Ill. 2d at 23. From this, plaintiffs argue that our supreme court, in assessing an attorney's duty to a nonclient, established a dichotomy depending on whether the representation is adversarial or nonadversarial, citing, among others, *Jewish Hospital of St. Louis, Missouri v. Boatmen's National Bank of Belleville*, 261 Ill. App. 3d 750, 761 (1994) ("Our supreme court has strongly embraced the concept that third-party-beneficiary status should be easier to establish when the scope of the attorney's representation involves matters that are nonadversarial, such as in the drafting of a will, rather than when the scope of the representation involves matters that are adversarial ***."). Plaintiffs assert that the scope of Suits' representation in this case was nonadversarial. Because of the purportedly lesser standard in nonadversarial matters and because the reinstatement of RPF was assertedly nonadversarial, plaintiffs conclude that Suits' duty should be extended to them because they should be deemed the intended beneficiaries of Suits' undertaking here. We disagree.

¶ 39 Initially, we note that the supreme court's comment about courts being more willing to extend an attorney's duty to a nonclient third party in a nonadversarial matter referred to the California courts and the California balancing approach. *Pelham*, 92 Ill. 2d at 22. Thus, to say that *Pelham* advocated a less stringent approach to determining an attorney's duty to a nonclient third party in a nonadversarial matter wrenches the comment from its context and is, perhaps, a bit of an overstatement. Nevertheless, Illinois courts seem to have accepted that interpretation. See *Jewish Hospital*, 261 Ill. App. 3d at 761.

¶ 40 More importantly, however, plaintiffs fail to directly analyze the circumstances of this case to determine if they were the intended beneficiaries of Suits' representation of RPF. Even in the cases cited by plaintiffs for the purpose of proving their position that an attorney's duty in a nonadversarial representation is viewed more expansively than in an adversarial matter, the key inquiry was whether the attorney acted at the direction of or on behalf of the client to benefit or influence the third party. For example, in *McLane v. Russell*, 131 Ill. 2d 509 (1989), a legal malpractice case arising from the drafting of a will, the court did not even mention the adversarial-versus-nonadversarial language in *Pelham* even though it relied upon *Pelham* in resolving the issue. The evidence in *McLane* showed that the decedent had decided to devise her interest in a family farm to the plaintiffs, who were the farm's long-time tenants. *McLane*, 131 Ill. 2d at 518. The lawyer drafted the provision so that the plaintiffs would receive the decedent's interest only if the decedent's sister predeceased her, but the decedent died first, and the farm eventually passed to someone else. *McLane*, 131 Ill. 2d 513. The attorney argued that extending his duty to the plaintiffs would conflict with *Pelham* because it would authorize both contingent and intended beneficiaries under a will to sue an attorney. *McLane*, 131 Ill. 2d at 517. The court reiterated the *Pelham* holding, that the key consideration is whether the attorney acted at the direction of or on behalf of the client to benefit or influence a third party, and, after reviewing the evidence, it concluded that the attorney had acted at the direction of the decedent to devise her interest in the farm to the plaintiffs, regardless of whether her sister predeceased her. *McLane*, 131 Ill. 2d at 518-20. The court expressly held that, "[a]pplying the 'intent to directly benefit' standard in *Pelham*

to the facts alleged in the complaint, we conclude that the plaintiffs were intended, rather than contingent, third-party beneficiaries of the contract for professional services between the defendant-attorney and his client, [the decedent]." *McLane*, 131 Ill. 2d at 520.

¶ 41    In *Ogle v. Fuiten*, 102 Ill. 2d 356, 363 (1984), the court again relied upon *Pelham*, but this time, it also noted that the controversy concerned the drafting of a will, which was a nonadversarial matter. Throughout the opinion, the court referred to cases that determined that third parties were intended beneficiaries of negligently drawn wills. *Ogle*, 102 Ill. 2d at 362. Additionally, the court expressly noted that the plaintiffs had alleged that they were the intended beneficiaries of the will allegedly negligently drafted by the defendant. *Ogle*, 102 Ill. 2d at 363.

¶ 42    In *Jewish Hospital*, 261 Ill. App. 3d at 760, the court relied on *Ogle* in holding that the attorney owed a duty to the plaintiffs for mistakes made in drafting a will. The court noted that the supreme court had "strongly embraced the concept that third-party-beneficiary status should be easier to establish when the scope of the attorney's representation involves matters that are nonadversarial, such as in the drafting of a will, rather than when the scope of the representation involves matters that are adversarial." *Jewish Hospital*, 261 Ill. App. 3d at 761. Despite its reference to the adversarial-versus-nonadversarial dichotomy, the court nevertheless analyzed the facts to determine whether there was an indication that the plaintiffs were intended third-party beneficiaries of the will at issue. *Jewish Hospital*, 261 Ill. App. 3d at 760-61. Indeed, the court held that "it is clear from the mere reading of the will in the case at bar that the testator intended to benefit [the] plaintiffs." *Jewish Hospital*, 261 Ill. App. 3d at 761.

¶ 43    There is a consistent thread in *McLane*, *Ogle*, and *Jewish Hospital*, namely, the paramount consideration of whether the attorney acted at the direction of or on behalf of the client to directly benefit or influence the third party. Despite the nonadversarial nature of the representations in *McLane*, *Ogle*, and *Jewish Hospital*, those courts still accorded primary weight to whether the plaintiffs were intended beneficiaries of the legal representation by the defendant attorneys. In this case, plaintiffs contend that the reinstatement of RPF from its administrative dissolution was a nonadversarial undertaking. Even accepting this as true for the purpose of argument, we cannot avoid the consideration of whether Suits' representation of RPF was undertaken to directly benefit plaintiffs. We see nothing in the evidence that indicates that the representation was designed to insulate plaintiffs from potential personal liability for the business that RPF conducted while it was dissolved. Instead, the evidence shows that the reinstatement was, at most, intended to put RPF in the condition where plaintiffs could continue with their intention of selling RPF's assets to an interested buyer. The protection of plaintiffs from personal liability was only incidental to that primary purpose. Accordingly, despite any relaxation accruing from the nonadversarial nature of the representation, we cannot conclude that Suits owed a duty to plaintiffs as intended third-party beneficiaries of his representation of RPF.

¶ 44    Plaintiffs next contend that a duty should be imposed on Suits because it was plaintiffs and not RPF who were most at risk from any failure to reinstate RPF. Again, while this assertion may be true, there is no case law that supports plaintiffs' implied point that, in such a situation, the lawyer should bear the risk of harm to third parties arising from his

-11-

negligence in the representation of his client. Additionally, we cannot escape the paramount command of *Pelham*, namely, to consider whether the third party was an intended beneficiary of the client's representation by the attorney. Simply because the third parties here, plaintiffs, were at risk of personal liability does not transform the incidental benefits of Suits' representation of RPF into direct and intended benefits for plaintiffs. In considering the difference between incidental benefits and direct benefits, we find *York v. Stiefel*, 99 Ill. 2d 312 (1983), to be helpful.

¶ 45     In *York*, the husbands had retained an attorney to help them navigate business problems, including bankruptcy and potential criminal liability. Consulting only his memory and none of the documents, the attorney instructed the husbands to sign personal guarantees and take second mortgages on their homes in order to keep their business afloat for another 30 days while they sought financing elsewhere. *York*, 99 Ill. 2d at 317-18. The attorney believed that the husbands were already personally liable; their original loan, however, was not personally guaranteed. At the end of the 30-day period, the husbands had not secured financing, and the business was closed and its assets sold. The husbands also lost their houses. *York*, 99 Ill. 2d at 318. The wives claimed that they were intended beneficiaries of the representation because they too signed the personal guarantees and second mortgages. *York*, 99 Ill. 2d at 320. The court found that the attorney owed no duty to the wives. Even though the wives signed the documents, and even though the attorney negotiated a homestead exemption in the second mortgages, from which the wives benefitted, the court concluded that no duty arose to the wives. The benefit from the homestead exemption did not make the wives intended beneficiaries; instead, they were no more than incidental beneficiaries because the purpose of the attorney's representation of the husbands was directed at saving their business. *York*, 99 Ill. 2d at 320-21.

¶ 46     In determining intended versus incidental beneficiaries, the court continued its focus on the client and the goal of the representation. *York*, 99 Ill. 2d at 320-21. Because the husbands were clients, and the goal of the representation was to help keep the husbands' business afloat, the court could not conclude that the wives were intended beneficiaries of the attorney's actions.

¶ 47     Likewise here. Although Haul retained Suits, he did so on behalf of and as an agent for RPF. Haul admitted that Suits was not retained to represent any of the plaintiffs as individuals, but was retained to represent only the corporate entity while it was being reinstated. The goal of the representation was RPF's reinstatement. That plaintiffs would receive the benefit of terminating any continuing exposure to personal liability for business conducted by RPF was incidental to the goal of reinstating RPF. Accordingly, we cannot conclude that plaintiffs were any more than incidental beneficiaries of Suits' representation.

¶ 48     Plaintiffs' contention seeks to invoke the courts' role in determining whether a duty exists. "Duty is a question of whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Turner v. Northern Illinois Gas Co.*, 401 Ill. App. 3d 698, 704 (2010). In determining the existence of a duty, a court will consider certain relevant factors, including: (1) the reasonable foreseeability that the defendant's conduct might injure another; (2) the likelihood of an injury occurring; (3) the magnitude of

the burden of guarding against such injury; and (4) the consequences of placing that burden on the defendant. *Turner*, 401 Ill. App. 3d at 704-05. Plaintiffs' contention combines the third and fourth factors of this consideration, while presupposing that plaintiffs and defendants stand in such relation to each other that a duty *may* be imposed. This is the error of plaintiffs' contention, the assumption that their relationship with defendants will support a duty.

¶ 49 Suits represented the corporate entity, RPF, and did not represent any plaintiffs in their individual capacities. Thus, plaintiffs were not Suits' clients, but third parties. *Pelham* gives us the tools to determine whether the relationship between the parties will support a duty, even while *Turner* provides the tools to determine whether the duty exists. The question posed by plaintiffs' contention, then, cannot be asked until the issue of the relationship of the parties has been determined. Plaintiffs contend that, under *Turner,* a duty exists because plaintiffs bore the greater burdens and risks resulting from a botched reinstatement, both personally and as a matter of public policy. Although that may be true, we do not reach that question, because we have determined that, under *Pelham*, *York*, *McLane*, *Ogle*, and *Jewish Hospital*, the parties do not stand in such a relationship that a duty may be imposed on defendants. Plaintiffs' contention, then, makes the faulty presupposition that the relationship of the parties will support a duty between them. As a result, we need not further consider this contention.

¶ 50 Plaintiffs next contend that reinstatement is a simple task, and it is made no more difficult if the attorney's duty is extended to include those at risk if the attorney bungles the task. We first note that plaintiffs include no citation to authority to support their position, thereby forfeiting our review of this contention. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006); *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 720 (2010). More importantly, this contention suffers from the same infirmity as the preceding contention: it presupposes the existence of a relationship between the parties that will support the imposition of a duty on one to act for the benefit of the other. Again, plaintiffs' contention concerns the factors used to determine the existence of a duty without first establishing that the parties stand in such a relationship that a duty may be imposed. Further, plaintiffs seem to suggest that, in addition to the normal rules surrounding the imposition of a duty, we should create an exception that automatically imposes a duty on a lawyer to all third parties who could be harmed by the lawyer's negligence if the task the lawyer is performing for the client is "simple." There is no authority for creating such an exception, to say nothing about defining which legal tasks are "simple." Additionally, we see no benefit to such a proposition, other than the job security that would attach to the inevitable litigation that such a result would engender. We need not further address plaintiffs' contention on this point.

¶ 51 Plaintiffs' final contention on the issue of duty is that we should impose a duty on defendants because Suits knew or should have known that plaintiffs would rely on him to protect their interests in having RPF reinstated. Plaintiffs base this contention on *dicta* in *Pelham*. In *Pelham*, the plaintiffs were children whose mother the defendant attorney had represented in her divorce from the children's father. The father was required by the divorce decree to maintain life insurance with the children as the prime beneficiaries of the policies.

-13-

The father did not do so and instead named his second wife as beneficiary of his life insurance policy. The second wife received the proceeds of the father's life insurance policy after he died, and the plaintiffs alleged that the defendant attorney had committed legal malpractice by failing to make sure that the father complied with the divorce decree. *Pelham*, 92 Ill. 2d at 16. The court held that the children were not intended beneficiaries of the mother's representation by the defendant attorney, but were only incidental beneficiaries at best, so the defendant attorney owed the children no duty. *Pelham*, 92 Ill. 2d at 23. Plaintiffs base their contention on the following *dicta*:

"We believe a different situation would confront us if this complaint had alleged sufficient facts to show that the defendant had undertaken a duty to notify the insurance company or the [father]'s employer of the provision in the divorce decree. In that situation, the attorney may have a duty to exercise reasonable care because his client and the plaintiffs herein could have justifiably relied on that undertaking." *Pelham*, 92 Ill. 2d at 24.

Plaintiffs argue that the same result as is implied in the above-quoted *dicta* should obtain here, and we should impose a duty on Suits regarding his undertaking of reinstating RPF. We disagree.

¶ 52       In the *Pelham dicta*, the court noted that a duty might have been imposed had the defendant attorney voluntarily undertaken the additional task of notifying the court or the father's employer in addition to the task he was retained to do, namely, obtain a divorce from the father for the mother. To have a situation similar to that described in the *Pelham dicta*, then, Suits would have had to voluntarily undertake another task for plaintiffs in addition to his representation of RPF for the purpose of reinstating it. Suits did not undertake any additional tasks, and *Pelham*'s *dicta* are inapposite to the factual circumstances of this case and cannot serve as a basis for imposing a duty on Suits to act for the benefit of plaintiffs, who were nonclient third parties. Accordingly, we reject plaintiffs' contention.

¶ 53       Plaintiffs next argue that there were material issues of fact that should have precluded the entry of summary judgment. We have determined, however, that the undisputed facts failed to establish that defendants owed plaintiffs a duty. In the absence of a duty, which is an issue of law to be determined by the court, a claim of negligence may not stand. See, *e.g.*, *Pelham*, 92 Ill. 2d at 18-19. If the undisputed facts fail to support a duty, then, even if there are other, disputed facts that would otherwise prevent summary judgment, summary judgment is nevertheless proper because the claim of negligence cannot be maintained in the absence of a duty. We need not, therefore, further consider plaintiffs' contentions regarding further factual disputes.

¶ 54       Plaintiffs also raise a number of other issues challenging the trial court's judgment. Having found that no duty exists, and thereby finding that the trial court's judgment was proper, we need not address any of these issues, as the failure to demonstrate the existence of a duty owed by defendants to plaintiffs is dispositive.

¶ 55       For the foregoing reasons, the judgment of the circuit court of Ogle County is affirmed.

¶ 56       Affirmed.